**UNITED STATES of America ex rel. Thelma SIMON**

v.

**James P. MURPHY, Superintendent, State Correctional Institution at Muncy.**

**Civ. A. No. 72–625.**

United States District Court,
E. D. Pennsylvania.

Oct. 25, 1972.

---

Thomas C. Carroll, Philadelphia, Pa., for relator.

Arlen Specter, Dist. Atty., W. Mark Sendrow, Asst. Dist. Atty., Philadelphia, Pa., for defendant.

OPINION

JOSEPH S. LORD, III, Chief Judge.

I. INTRODUCTION

The relatrix was indicted for the murder of her husband as of Court of Oyer and Terminer, Philadelphia County, August Sessions, 1961, No. 528. Following trial to a jury, she was found guilty of murder in the first degree and sentenced to life imprisonment. An attempted direct appeal was quashed as untimely filed. Commonwealth v. Simon, 413 Pa. 609, 198 A.2d 583 (1964). In 1968, relatrix was granted leave to file a direct appeal *nunc pro tunc* and the judgment of sentence was affirmed by an equally divided court. Commonwealth v. Simon, 432 Pa. 386, 248 A.2d 289 (1968).

Thereafter, relatrix applied for relief under the Pennsylvania PCHA,[1] alleg-

1. 19 P.S. § 1180-1 et seq.

ing suppression of evidence and ineffective assistance of counsel. Relief was denied on May 4, 1970. An appeal was taken to the Supreme Court of Pennsylvania, but on petition of relatrix and with the consent of the Commonwealth, the matter was remanded for a supplementary evidentiary hearing on the issue of an alleged conflict of interest between trial counsel and relator. After three days of hearings, the hearing judge, on February 24, 1971, denied relief. On appeal, the Supreme Court affirmed without reaching the merits of the claim. The court concluded *sua sponte* that relatrix had waived the conflict of interest claim by failing to raise it in her 1968 direct appeal. Commonwealth v. Simon, 446 Pa. 215, 285 A.2d 861 (1971). The Chief Justice and Mr. Justice Pomeroy dissented. Reargument was refused on February 1, 1972. The present petition followed.

## II. THE FACTS

The following facts are taken from the state trial transcript (referred to as "N.T."), two state PCHA hearings and two hearings before this court.

On the afternoon of May 7, 1961, relatrix admittedly stabbed her husband to death, a fact which she has never denied. The circumstances surrounding the actual killing are understandably somewhat muddy and the defense of the relatrix was ambivalent. Her testimony on direct examination first tended to present an accidental killing. At her trial, she testified (N.T. 182):

"* * * And when I got up he struck me across my head with the stick and across my shoulders and—

"Q Which shoulder was that?

"A My right shoulder, the right shoulder. And he struck me across my head. And so then, after that, when he grabbed me again, I grabbed for the pillow, and I reached my hand under there, and there was the knife. And when he grabbed me by my hair and we were struggling for the knife I must have—I don't know. It hit his chest. I thought it probably went in

the mattress, and I got panicky and I ran down the steps. * * *"

However, this claim was rather effectively destroyed on cross-examination (N.T. 271–272):

"Q And with you on top, your bodies about alongside of each other, not knowing which hand the knife was in, you just lunged it down at him; is that right? Is that right?

"A (No reply)

"Q Is it?

"A Yes.

* * * * * *

"Q That is what you are telling this jury, you came down. An overhand motion; is that right?

"A Yes.

"Q With you on top of him? Is that what you are telling this jury?

"A Yes."

The other defense advanced by relatrix was that the killing was done in self-defense. She testified (N.T. 195):

"Q But you were in fear of him?

"A Yes, I was in fear with him.

"Q Were you in fear of your life with him?

"A Yes.

"Q Or that he might give you grievous bodily harm or kill you, or something?

"A Yes.

"Q And was that the state of mind you were in when this incident occurred on May the 7th?

"A Yes. * * *"

However, relatrix offered no testimony to show that she believed it was necessary to kill in order to save herself or that she made any attempt to retreat to avoid the danger. Finally, although there was testimony that relatrix had been abused by her husband, her testimony also showed that she herself was guilty of hostile and provocative conduct.

Under Pennsylvania law, the evidence fell far short of establishing the essential elements of self-defense. In Com-

monwealth v. Johnston, 438 Pa. 485, at page 489, 263 A.2d 376, at page 379 (1970), the court set forth the necessary ingredients of self-defense:

"(1) The slayer must have been free from fault in provoking or continuing the difficulty which resulted in the killing * * *. (2) The slayer must have reasonably believed that he was in imminent danger of death, great bodily harm, or some felony, and that there was a necessity to kill in order to save himself therefrom * * *.

(3) The slayer must not have violated any duty to retreat or avoid the danger * * *." [citations omitted]

Relatrix' evidence fulfilled none of these criteria.

Before her arrest on May 7, 1961, relatrix had consulted Matthew Kramer, Esq.[2] in connection with a divorce. On the night of the arrest, Kramer was called and came to the police station. There were no discussions of fee at that time. A typed notation dated December 4, 1961 reads:[3]

"12/4/61 Mrs. Bromley [relatrix' aunt] called, and M. K. told her to get together two hundred dollars. Wants to know if we can get our fee out of the insurance policy proceeds. Told her that would be contingent upon Mrs. Simon's acquittal and payment by the company, but we have to have two hundred dollars before we can go ahead with the case."

By letter dated December 9, 1961, Kramer informed relatrix that he would get the balance of his fee from the insurance policy.

When relatrix was brought to trial, the assistant district attorney offered to certify that the charge would not rise higher than second degree murder in exchange for a plea of guilty to murder generally. This bargain was conditioned upon its acceptance before the jury was selected.

Relatrix testified before us, and we find as facts that:

(1) the proposed bargain was never communicated to her by Kramer until after the jury had been selected;

(2) Kramer never explained to her the potentialities of conviction and sentence vs. plea and sentence, but simply advised her to stand by her plea of not guilty;

(3) if he had explained the weaknesses of her defense and the possibility of life imprisonment, she would have been willing to plead guilty.

III. EXHAUSTION

■ We accept the reasoning and conclusion of Magistrate Powers in his report (attached as Appendix A), page 826.

IV. WAIVER OR BY-PASS

The only record before the Pennsylvania Supreme Court was the record of the murder trial, which did not and could not contain any evidence of the contingent fee arrangement, the plea-bargain offer and its untimely, unadvised transmittal to defendant. It is hardly reasonable to suppose that counsel would have raised at trial his own conflict of interest. There was, then, nothing in the record before the Pennsylvania Supreme Court in 1968 which would have supported the conflict of interest claim. Furthermore, since the question of conflict was not and could not have been raised at trial, it would seem that "any attempt to raise [it] * * * on appeal would have been rebuffed by our Court [the Supreme Court of Pennsylvania] under the well established doctrine that matters not raised at trial cannot be raised for the first time on appeal." Commonwealth v. Cheeks, 429 Pa. 89, 96, 239 A.2d 793, 797 (1968), Roberts, J. Nonetheless, the Pennsylvania Supreme Court found a waiver because "appellant prosecuted a *counseled* direct appeal from the judg-

2. Mr. Kramer died shortly before the second PCHA hearing.

3. This was typed on a letter dated November 20, 1961.

ment of sentence in 1968, in which she failed to raise the conflict of interest issue presently asserted." 446 Pa. at 218, 285 A.2d at 862.

■ However, a "state court's finding of waiver" does not "bar independent determination of the question by the federal courts on habeas, for waiver affecting federal rights is a federal question." Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963). The federal test is whether relatrix' conduct amounted to "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

We have been unable to discover any case which considers the guarantee of the effective assistance of counsel in the context of the present factual situation. Precisely posed, the question is this: where, in a capital case, defense counsel enters into an arrangement with defendant under which his fee is contingent upon the defendant's full acquittal, and where a plea bargain of less than first degree is offered, but not timely transmitted and explained to defendant and thereafter, defendant is convicted of first degree murder and sentenced to life imprisonment, was counsel laboring under such conflict of interest as to deprive defendant of the effective assistance of counsel? If so, the sequential question is: did defendant waive her constitutional right to effective assistance of counsel by the failure of her new counsel to raise the question on direct state appeal?

Unlike the Pennsylvania Supreme Court, we are not here concerned with whether, under state standards, there was a waiver within the meaning of a state statute. Rather, we are met with the question of whether, under federal standards, there was a deliberate bypass of available state procedures. In Fay v. Noia, 372 U.S. 391, at page 439,

83 S.Ct. 822, at page 849, 9 L.Ed.2d 837 (1963), the Court said:

"* * * If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forwent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. * * * A choice made by counsel not participated in by the petitioner does not automatically bar relief. * * *"

■ Focusing our attention on the 1968 nunc pro tunc direct appeal, under no reasonable view can it be said that Thelma Simon there deliberately bypassed a state remedy. There is absolutely nothing to show that the relatrix made a deliberate, conscious choice in 1968 to forgo her present claim of ineffective counsel. In order to show that relatrix herself made a choice, it would be necessary to show: (1) that she knew what "conflict of interest" meant; (2) that she had knowledge that the Pennsylvania Slayers' Act[4] required complete acquittal before the insurance proceeds would be available to her; (3) that she realized that the contingent fee arrangement vis-a-vis the Slayers' Act created a conflict; and (4) the impact of the conflict upon her representation and trial. We refuse to indulge in whimsical speculation that relatrix had such knowledge.

So far as her counsel on appeal is concerned, it is enough to say that there is no imaginable tactical reason that would justify the failure to raise this

4. Act of Aug. 5, 1941, P.L. 816, 20 P.S. §§ 3441–42.

point. It is not only likely, but almost certain that the 1968 counsel simply did not recognize or appreciate the first-impression argument that could possibly be made on his client's behalf. This conclusion is fortified by the fact that the conflict nowhere appeared in the record from which counsel argued the 1968 appeal. All of this leads ineluctably to the conclusion that in 1968, the relatrix did not, "after consultation with competent counsel or otherwise, understandingly and knowingly [forgo] the privilege of seeking to vindicate [her] federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures". Fay v. Noia, *supra*. In short, there was no choice by counsel knowingly participated in by relatrix. Comity does not require that we refrain from considering the merits.

## V. THE MERITS

█ The Pennsylvania Act of August 5, 1941, P.L. 816, § 2, 20 P.S. § 3442, provides:

"No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following."

Section 1 of the Act (20 P.S. § 3441) defines "slayer":

"As used in this act—

"(1) The term 'slayer' shall mean any person who participates, either as a principal or as an accessory before the fact, in the wilful and unlawful killing of any other person."

It is at once apparent that Kramer's contingent fee arrangement was valueless unless his client was acquitted. A plea of guilty would not only destroy relatrix' right to the insurance proceeds, but also counsel's hope for further compensation. It is hard to imagine a more striking example of blatant conflict between personal interest and professional duty.

That conflict infected relatrix' trial from beginning to end. Well knowing that the bargain would be withdrawn unless it was accepted before the jury was sworn, Kramer did not communicate the offer until it was too late. Even then, he made no effort to explain the ramifications of a plea to his client. Instead, he simply advised her to persist in her plea of not guilty. It is at best doubtful that relatrix' evidence raised even a colorable claim of self-defense or accidental killing, but in any event "defense counsel should have realistically assessed appellant's claim in view of the available alternatives", Commonwealth v. Simon, *supra*, dissent, 446 Pa. at page 223, 285 A.2d at page 864, and conveyed this assessment to his client. He did not. Finally, Kramer presented no points for charge on lesser degrees of homicide. His failure to take exception to the charge on voluntary manslaughter was the key issue in the affirmance of relatrix' direct appeal in 1968 and was vivid evidence of his lack of concern in a lesser conviction.

A conflict of interest arises where the lawyer is faced with the task of giving advice to the client on optional courses of action where the lawyer stands to benefit personally from the adoption of one course to the exclusion of the other. Translated into specifics, we hold that here Kramer's contingent fee agreement created a conflict between his personal interests and those of his client. To put it bluntly, by advising the persistence in a not guilty plea, Kramer had nothing to lose but his client's life.

The Commonwealth argues that relatrix was not prejudiced because she relied throughout on her claim of self-defense. We, however, have found that relatrix would have pleaded to second degree if she had had proper counseling. The fact is and remains that relatrix was deprived of the effective assistance of counsel. And "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." Glasser v. United States, 315 U.S.

60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).

In United States ex rel. Miller v. Myers, 253 F.Supp. 55, at page 57 (E.D.Pa. 1966), Judge Davis said, speaking of conflicting interests of counsel:

"* * * A showing of actual prejudice is not required; all that is necessary is a showing of a conflict.

* * * * * *

"We are dealing here with the life of an individual who stood to be incarcerated for 20 years. His right to counsel under the Constitution is more than a formality, and to allow him to be represented by an attorney with such conflicting interests as existed here without his knowledgeable consent is little better than allowing him no lawyer at all. * * * This situation is too fraught with the danger of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of relator's rights whether or not it in fact influences the attorney or the outcome of the case."

See also People v. Stoval, 40 Ill.2d 109, 239 N.E.2d 441 (1968).

## VI.  CUSTODY

■ We have been advised that relatrix was released on parole as of October 19, 1972. This fact, however, does not dissolve our jurisdiction. "While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the * * * Parole Board within the meaning of the habeas corpus statute * * *." Jones v. Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed2d 285 (1963).

For the foregoing reasons, the writ will be granted.

## APPENDIX A

In the United States District Court for the Eastern District of Pennsylvania

| | |
|---|---|
| United States of America ex rel. THELMA SIMON<br><br>v.<br><br>James P. Murphy, Superintendent, State Correctional Institution at Muncy | Civil Action<br><br><br><br><br><br>No. 72–625 |

### REPORT—RECOMMENDATION

RICHARD A. POWERS, III,
MAGISTRATE                 APRIL 1972

Habeas Corpus. Relator, a state prisoner, was convicted of murder in the first degree after trial to a jury in May, 1961, and she was sentenced to life imprisonment. No direct appeal was taken from this judgment of sentence.[1]

Thereafter, relator was granted leave to file a direct appeal *nunc pro tunc* in 1968. The Supreme Court, being evenly divided, affirmed the judgment of sentence. Commonwealth v. Simon, 432 Pa. 386, 248 A.2d 289 (1968).[2]

Subsequently, relator applied for relief under the Post Conviction Hearing Act[3] and alleged suppression of favorable evidence and ineffective assistance of counsel. This petition was heard by three judges, sitting en banc, and relief was denied on May 4, 1970.

An appeal was taken to the Supreme Court of Pennsylvania, but, on petition of relator and with the consent of the

---

1. Relator's initial direct appeal was quashed as untimely filed. Commonwealth v. Simon, 413 Pa. 609, 198 A.2d 583 (1964).

2. In her appeal, relator alleged the following grounds:
   (a) The trial judge erred in his charge to the jury.
   (b) The prosecutor made prejudicial comments to the jury.
   (c) The Commonwealth introduced prejudicial rebuttal evidence.
   (d) The Commonwealth introduced prejudicial evidence to impeach one of her character witnesses.

3. 19 P.S. Anno. § 1180–1 et seq.

Commonwealth, the matter was remanded for a supplementary evidentiary hearing on the issue of an alleged conflict of interest between trial counsel and relator.

In December, 1970, three days of hearings were held on the conflict of interest question.[4] On February 24, 1971, the hearing judge filed an opinion denying the petition.

In his opinion, the judge found the following facts:

"The defendant was represented by Matthew Kramer, Esq., a member of the Philadelphia Bar. Sometime prior to the defendant's arraignment, Mr. Kramer was given a Two Hundred Dollar retainer fee. He then entered his appearance and plead the defendant not guilty. After this, but prior to trial, an understanding was reached between Kramer and his client that the balance of his fee would be paid out of the proceeds of a certain insurance policy.

The defendant was charged with the killing of her husband. From the time Kramer first met the defendant, until this day, the defendant did maintain that she killed him in self-defense. The insurance policy involved was one on the life of the victim. Of course, if the defendant was found guilty of homicide, she could not be the beneficiary of the insurance policy because of the Slayer's Act.

It is alleged the conflict of interest exists because Kramer's fee was contingent upon his client being found not guilty. Thus, it is argued, Kramer was motivated against accepting a second-degree plea bargain offered by the district attorney prior to trial.

After a full trial before the Court and a jury, the defendant was found guilty of first degree murder and sentenced to life imprisonment.

We believe that Kramer's conduct is to be judged by the standard of conduct promulgated in Commonwealth ex rel. Washington v. Maroney, 427 Pa. 599, [235 A.2d 349], which is as follows:

". . . counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record.'

It is clear that the defendant maintained throughout that she had killed her husband in self-defense. With this in mind, we do not believe that Kramer's advice not to accept the plea bargain was unreasonable. We believe he had every reason to believe that he could get a verdict of acquittal or of guilty to a lessor degree of homicide. Further, we believe that the matter concerning the fee and the insurance policy did not create a conflict which led to ineffective assistance of counsel under the law of this Commonwealth."

An appeal was taken to the Pennsylvania Supreme Court which did not reach the merits of petitioner's claim but, *sua sponte*, concluded that relator had waived her conflict of interest claim because she failed to raise the issue in her counseled direct appeal in 1968 when she was represented by different counsel. Commonwealth v. Simon, 446 Pa. 215, 285 A.2d 861 (1971) reargument was refused on February 1, 1972.

Chief Justice Jones filed a dissenting opinion [5] in which he noted relator's contention "to be one of first impression in these United States." The Chief Justice also noted the recent decision of the Court of Appeals for the Third Circuit, United States ex rel. Johnson v. Cavell, 468 F.2d 304 (1971) which held the Pennsylvania presumption of waiver to be "an unacceptable basis for denying appellant relief. . . ."

The Court of Appeals held also that the District Court had to hold a hearing

4. Trial counsel's death intervened and precluded his testimony at that hearing.

5. Mr. Justice Pomeroy also dissented.

on the issue of waiver and placed upon the relator the "burden of pleading and of proving that his failure to raise an issue in a prior proceeding was not knowing and understanding." (p. 308).

In her federal petition, relator again raises the conflict of interest ground and also attacks the decision of the Supreme Court in holding that relator waived this issue.

In construing a federal petition for habeas corpus, it is the duty of a federal court to independently examine the record [6] to determine whether the facts have been accurately found by the state court and federal law correctly applied. Maes v. Patterson, 401 F.2d 200 (10 Cir. 1968).

We conclude that federal law was not correctly applied by the State Court on the waiver issue and an evidentiary hearing must be held. Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (March 22, 1972), United States ex rel. Johnson v. Cavell, *supra*.

If after the hearing, the Court concludes that relator did not make an understanding and knowing waiver of asserting her federal claim in the state court, it will be necessary to determine whether the merits of the conflict of interest issue should be decided by this Court or should the relator be required to again present this issue to the State Supreme Court which has never decided the merits of the claim.

Since there is now no appeal available to the relator, this Court could consider the merits of the petition because 28 U.S.C.A. § 2254 "is limited in its application to failure to exhaust state remedies still open to the habeas applicant at the time he files his application in federal court." Fay v. Noia, 372 U.S. 391, 435, 83 S.Ct. 822, 847, 9 L.Ed.2d 837 (1963).

Even under the standard set forth in the recent decision of Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) the State Court "had a fair opportunity to consider [the conflict of interest] claim and to correct that asserted constitutional defect in [relator's] conviction." (p. 276, 92 S.Ct. p. 513). But, even with knowledge of the existence of United States ex rel. Johnson v. Cavell, *supra*, the State Court did not follow the dictates of that opinion as noted in Chief Justice Jones' dissent. This case is unlike Pennsylvania ex rel. Raymond v. Rundle, 339 F.2d 598 (3 Cir. 1964) where because of intervening changes in federal law by the Supreme Court the relator was required to resubmit his petition to the state court for its consideration in light of those decisions.

While comity requires federal courts to accord due respect to the delicate balance between state and federal judicial systems, it is not intended to frustrate relief in the federal courts. "The entire notion of requiring a petitioner to run the gamut of state remedies twice seems ill-founded. Not only is it without statutory foundation but it gives far too great weight to hypothetical institutional interests. The petitioner is supposed to exhaust his remedies, not himself." Sokol, Federal Habeas Corpus p. 170 (2d ed. 1969).

Accordingly, we make the following

## RECOMMENDATION

Now, this 25th day of April, 1972, it is respectfully recommended that a hearing be held.

[s] Richard A. Powers
Richard A. Powers, III
United States Magistrate

---

6. Because of the present unavailability of the original record, due to the fact that an untried indictment charging relator with the voluntary manslaughter of her husband is scheduled for trial on June 1, 1972, the Public Defender has provided us with copies of the trial transcript and the Post Conviction Hearing transcripts for March 13, 1970, and for the three hearings held in December, 1970. These copies are sufficiently accurate to dispose of relator's petition. United States ex rel. Howard v. Rundle, 452 F.2d 904 (3 Cir. 1971). Also see the letter from Hon. Edward S. Lee, Clerk of Quarter Sessions Court, advising us of the unavailability of the record.