OPINION OF THE COURT
Robert L. Cohen, J.
The defendant, Charles Alexander, was convicted on April 12, 1976, after a one-week jury trial of the crime of criminal sale of a controlled substance in the first degree under indictment 810/74, and was sentenced on May 18, 1976, to an indeterminate term of imprisonment of 25 years to life (William J. Drohan, J., at trial and sentence).
On June 6, 1986, the defendant, represented by new counsel, moved to vacate the judgment of conviction, pursuant to CPL 440.10 (1) (f) and (h), arguing that he was denied the effective assistance of counsel in the trial court and on appeal.
The defendant contends that his trial counsel was constitutionally ineffective because a plea bargain offer was made by the prosecution before trial, but his attorney failed to communicate it to him. Defendant also argues that he was deprived of the effective assistance of appellate counsel by counsel’s failure to argue effectively that the Trial Judge improperly considered a pending indictment at the time sentence was imposed, and by counsel’s failure to argue that defendant’s sentence was excessive.
Defendant’s conviction after trial was affirmed by the Appellate Division, without opinion (People v Alexander, 56 AD2d 740 [1st Dept 1977]), and leave to appeal to the Court of Appeals was denied (42 NY2d 826 [1977]). The United States Supreme Court denied certiorari (Alexander v New York, 434 US 836 [1977]). Thereafter, defendant filed an application for a writ of habeas corpus pursuant to 28 USC § 2254, which was dismissed in an unreported opinion by United States District Judge Gerard L. Goettel (73 Civ 572), on March 7, 1978. The United States Court of Appeals affirmed. (Alexander v Harris, 595 F2d 87 [2d Cir 1979].)
In the trial court and throughout the appellate process and collateral challenge in the Federal court, defendant was represented by the same retained counsel, Herbert S. Siegal, Esq.
A CPL 440.10 motion is procedurally the appropriate vehicle to raise in this court a claim of ineffective assistance of trial counsel (see, People v Bachert, 69 NY2d 593) but may no longer be used to raise a claim of ineffective assistance of *575 appellate counsel (see, People v Bachert, supra, revg 121 AD2d 802). Accordingly, defendant’s request to vacate the judgment of conviction on the ground that he was denied the effective assistance of appellate counsel is denied without prejudice to renew in the proper forum.[1] (People v Bachert, supra.)
The People opposed the granting of a hearing, arguing, in substance, that the failure to convey a plea bargain does not constitute the ineffective assistance of counsel; that defendant received a fair trial and guilt was overwhelmingly proven; that the People have been prejudiced by the delay in bringing the 440 motion since Mr. Siegal died in March 1983; that the People cannot locate their files to refute defendant’s claim; that public policy requires denying the motion without a hearing to deter convicted inmates from making specious claims after their attorneys have died, and finally, that defendant’s obvious self-interest in overturning a 25-year-to-life sentence warrants summary denial of his motion.
A hearing was granted because defendant’s motion papers articulately and persuasively presented a viable claim that he had been denied the effective assistance of counsel in the trial court. (See, CPL 440.30 [5].) Once the defendant establishes through a sworn affidavit that is not incredible on its face and is not shown to be false by unquestionable documentary proof, that he was denied a constitutional right, a full hearing is required to explore the issue raised. (People v Chait, 7 AD2d 399, 401 [1st Dept 1959]; see also, People v Satterfield, 66 NY2d 796, 799; People v Oddo, 283 App Div 497, 499 [1st Dept 1954].)
Inasmuch as the People were not able to conclusively refute with any documentary proof defendant’s claim that a plea bargain was offered but not conveyed to him, a hearing was held to resolve issues of fact, viz., whether the prosecution made a plea offer to defense counsel and whether the plea offer was communicated to defendant.
*576 I. BACKGROUND
The defendant was convicted of selling three ounces of cocaine to an undercover policewoman for the sum of $3,000. The sale took place on January 29, 1974, in the defendant’s apartment and no one was present except defendant, the undercover officer, and a confidential informant named Oscar Wilson who was deceased at the time of defendant’s trial.
The defendant was arrested for the January 29th sale on March 16th; an indictment had been filed on March 7th charging him with the class A-I felony of criminal sale of a controlled substance in the first degree.
The arrest on March 16th took place at defendant’s apartment, and pursuant to a search of the apartment, the police seized $5,039 in cash from a locked metal container found in defendant’s bedroom. It was determined that a 100 dollar bill which was part of the $5,039 in cash found in the locked metal container had the same serial number as a 100 dollar bill given to defendant by the undercover officer on January 29.
The March 16th search of defendant’s apartment resulted in another indictment (854/74), returned on March 28, 1974, charging defendant with the crimes of criminal possession of a weapon as a misdemeanor, and criminal possession of a controlled substance in the seventh (cocaine) and sixth (marihuana) degrees.
At the time of trial on indictment 810/74, the defendant had pending indictment 854/74, as mentioned previously, and indictments 1403/74, charging him with murder, and 2460/74,[2] charging him with conspiracy in the first degree. Herbert Siegal represented him on all four indictments.
Shortly after defendant’s March 16th arrest, on April 9, 1974, a notice of appearance was filed in the Supreme Court, Bronx County, by the law firm of Siegal & Randolph, by James W. Randolph.[3]
Prior to trial, defendant moved to controvert a wiretap order, dated January 11, 1974 (Lawrence H. Bernstein, J.), *577 and "to suppress any evidence and leads obtained therefrom relating to my arrest and indictment”.[4]
Justice Bernstein’s order for the interception of defendant’s telephonic communications over his home telephone emanated from a New Jersey interception order and two extensions thereof of the home telephone of one Geraldine Shore. Miss Shore’s conversations with defendant led the New Jersey authorities to believe that the defendant was Shore’s supplier and they turned that information over to the New York authorities.
It was defendant’s contention in the trial court and throughout the appellate process that the New Jersey wiretap order was illegally issued and that the disclosure of information by New Jersey authorities to the New York police tainted all evidence thereafter acquired. In a decision dated January 1976, then Justice Mary Johnson Lowe rejected defendant’s contentions and denied defendant’s motion to controvert and suppress the evidence.
II. THE CPL 440.10 HEARING
The defense case consisted of the testimony of defendant’s wife, Rosetta Alexander, and the defendant. Defendant’s exhibits A through U were also received into evidence.
The People’s witnesses were former Assistant District Attorney Edward Rothman who prosecuted defendant; James W. Randolph, Mr. Siegal’s former law partner, and Alex P. Siegal, Mr. Siegal’s son. The People also introduced into evidence exhibits 1 through 25.
Rosetta Alexander, defendant’s wife, testified that she attended all court appearances and drove her husband to see his attorney during the time he was out on bail and preparing for trial. She and Dorothy Caputo,[5] Mr. Siegal’s secretary, would sit in on all meetings with the defendant and Mr. Siegel.
Mrs. Alexander testified that her husband met with his attorney at the latter’s office approximately 4 or 5 times before trial; these meetings lasted between 20 to 30 minutes and they were mostly for the purpose of paying the attorney. According to Rosetta Alexander, Mr. Siegal always insisted that Charles would "beat the case” because of an illegal *578 wiretap. She never heard anything about a plea bargain and to her knowledge it was never discussed.
Rosetta Alexander maintained that Mr. Siegal never stated during those meetings that if the defendant were convicted he faced a minimum sentence of 15 years to life. She testified that Mr. Siegal never spoke about the facts of the case, about the sale to the undercover police officer or the confidential informant. She never saw a lab report or heard mention of the 100 dollar bill that was discovered in the defendant’s apartment, until the trial.
After all appeals were exhausted, upon defendant’s request, Mrs. Alexander picked up a box of papers from Mr. Siegal and brought them to Mr. Alexander at Greenhaven Prison.
The defendant testified that he was arrested on March 16, 1974, and retained Herbert Siegal approximately one month later after he was recommended by some other prisoners incarcerated with him in the Bronx House of Detention. Defendant maintained that although he met with Herbert Siegal while incarcerated, and also spoke with him at court appearances, plea bargaining was never discussed. Mr. Siegal stated to him that they would win the case because of an illegality in the wiretap procedure.
On direct examination, defendant testified that he did not know there was a strong case against him; that he did not learn about the sale to the undercover officer until shortly before, trial, and that he learned of the existence of the 100 dollar bill during trial.
Prior to the March 16, 1974 arrest, his only previous conviction was in North Carolina, in 1952, for discharging a firearm within city limits (shooting at tin cans with other youths) when he was 17. He was fined $11 court costs. At the time of his conviction in the case at bar, defendant was 41 years old.
In late 1981, or early 1982, defendant learned that a plea offer had been made to his attorney. While going through the box of papers his wife had picked up from Mr. Siegal, he found a letter dated August 28, 1975, from Assistant District Attorney Edward Rothman, to Mr. Siegal, indicating that an offer had been made at a previous conference. Although the letter did not indicate what the offer was, handwritten in the margin was "3 to life” and "0 — 3”. The letter indicated the offer would remain open until the trial court ruled on a motion to suppress the information obtained from the wiretaps. This letter was admitted into evidence as defendant’s exhibit A.
*579 Defendant testified that he wrote to Mr. Siegal on March 16, 1982, asking why he had never been told of the offer, and requested that Mr. Siegal sign an affidavit attesting to the fact that an offer was made but not conveyed to him. A tissue carbon of this letter was admitted into evidence as defendant’s exhibit C.
Defendant received no answer to his letter of March 16, 1982, and he never pursued it with Mr. Siegal. Instead he wrote to Warren Replansky, an attorney representing him at that time in an article 78 proceeding in Dutchess County, to compel the court stenographers to provide him with some missing transcripts in his case. He gave Mr. Replansky the tissue carbon of the letter to Mr. Siegal,* 123**[6] as well as a copy of Mr. Rothman’s letter, and asked Replansky whether there were grounds to appeal based on this new information.
Defendant’s exhibit D is a letter from Warren Replansky to Robert Gombiener of Prisoners Legal Services (PLS) of Poughkeepsie dated May 21, 1982. In it Mr. Replansky asks Mr. Gombiener to review the materials Alexander had given him[7] to determine whether there was a basis for a new appeal or resentencing, and if so would PLS refer the matter to another attorney, such as David Steinberg.
Eventually, PLS did refer the matter to David Steinberg, who met with the defendant and who thereafter referred the matter to defendant’s present counsel, Oren Root, Jr.
Letters from Oren Root, Jr., to Charles Alexander were admitted into evidence as defendant’s exhibits K, M, P and Q. According to the letters, Mr. Root began reviewing the matter in December 1982. In June 1983, he wrote Mr. Alexander indicating that in his opinion there were legal grounds for a 440 motion. Mr. Root attempted to contact Mr. Siegal in June and July 1983 and discovered that he had passed away in March 1983. According to Mr. Root’s affirmation in support of the motion, the major cause of the delay from 1982 to 1986, *580 when the motion was filed, was defendant’s difficulty in paying the fees necessary for representation in this matter.
On cross-examination, defendant admitted that at his first meeting with Mr. Siegal in the Bronx House of Detention, Mr. Siegal informed him that he was charged with selling cocaine to an undercover police officer on January 29, and that the sale was alleged to have occurred in his apartment. He later stated that the first time he heard about the undercover officer and the 100 dollar bill was just as trial started. Alexander stated that he was not guilty of selling cocaine, but he would have pleaded guilty if promised a sentence of 3 years to life, and would have considered pleading guilty if promised a sentence of 6 Vs to life, rather than face a minimum penalty of 15 years to life. Defendant maintained that Herbert Siegal insisted the case would be won on the wiretap issue.
Edward Rothman, former Assistant District Attorney, was called by the People and testified that he had no clear, independent recollection of the case, however his letter indicated a plea offer had been made. Although he could not remember what the offer had been, in his judgment it would most likely have been a plea to an A-II felony.
James Randolph testified that he was Herbert Siegal’s partner between 1974 and 1975, and during that time they shared approximately 100 criminal cases. Mr. Randolph also had no independent recollection of defendant’s case, but recalled representing a codefendant, Gene Blocker, on indictment 2460/74, wherein defendant and others were charged with conspiracy in the first degree.
A note had been introduced into evidence as defendant’s exhibit B which Randolph testified had been written by him at some point during Alexander’s case. The note had been found by defendant in the box of papers he had received from Siegal in late 1981 or early 1982. Defendant’s exhibit B indicated that the District Attorney’s office had made defendant a plea offer of an "A-2 felony to cover”. Additionally, a notice of appearance filed on April 9, 1974, in the name of Siegal and Randolph signed by Randolph, was admitted into evidence as People’s exhibit 2.
Mr. Randolph testified that Siegal’s usual practice in felony cases would be to conference the case with the client and he (Randolph) would usually be present.[8] The discussion would *581 generally cover motions, trial tactics, strategies, possible pleas, possible sentences after conviction and lesser sentences that were possible after a plea.
Randolph related that when he told Mr. Siegal that Gene Blocker was going to plead guilty to the conspiracy charge, Mr. Siegal got extremely angry at him for recommending that his client accept the plea offer. Mr. Siegal said something about his client turning into an informer and remarked about Randolph’s having been a former District Attorney. Randolph had never had a conversation like that with Siegal.
When asked whether Mr. Siegal would have been interested in a plea bargain in a hypothetical case with facts similar to those in defendant’s case, Mr. Randolph stated that Mr. Siegal would have been interested in a plea because he could not be sure whether the motion to suppress the wiretap information would have been granted.
The final witness at this hearing was Alex P. Siegal, Herbert Siegal’s son, who was a former New York County Assistant District Attorney from 1973 to 1980. Alex worked for his father during his last two years of law school, 1972 and 1973. Additionally, he shared office space with his father from 1980 to 1982, during which time he participated in approximately 100 to 150 criminal cases with his father. Although he had no information about defendant’s case, their usual practice was to have the client come into the office for a conference. The client’s version of the facts, possible sentences, and possible plea bargains would be discussed. If the client said he was not guilty, plea bargains would still be discussed. Dorothy Caputo was never part of their conferences while Alex Siegal was there.
According to Alex Siegal, if his father believed there was a legal or factual basis to obtain a dismissal, it would have an effect on the advice his father gave to a client as to whether the client should plead guilty or go to trial. Alex Siegal believed that his father would have always discussed a plea offer with a client since his father realized that his belief that he could win his client’s case didn’t necessarily mean he would be successful at trial.
Evidence was introduced that the District Attorney’s office had been unable to locate their files, and they were thus unable to produce evidence indicating that any plea offers that had been made were withdrawn before trial. Moreover, there was no evidence that the defendant had refused offers that had been made.
*582 Sentence minutes on Alexander’s plea of guilty to conspiracy in the second degree under indictment 854/74 and covering indictments 2460/74 and 2461/74 were introduced as People’s exhibit 25. They indicated that on April 25, 1977, and April 29, 1977, the District Attorney’s office was unable to locate the defendant’s file regarding indictment 854/74.
Finally, the principal court reporter, Rosalie Labate, reported to the court on April 27, 1987, that an examination of microfilm rolls of stenographic notes on various court dates pertinent to this case failed to reflect "any reference^] to plea negotiations relative to the defendant Charles Alexander.”
III. defendant’s ineffective assistance of COUNSEL CLAIM — FAILURE TO COMMUNICATE PLEA OFFER
As previously noted, a hearing was held to determine whether a plea offer was made by the prosecutor to defense counsel and whether, if made, it was communicated to defendant. Additionally, if such a plea offer were made, I must determine whether the failure to communicate it constitutes ineffective assistance of counsel.
At the hearing "the defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion.” (CPL 440.30 [6].)
The preponderance standard is met when it produces " 'a reasonable belief in the truth of the facts asserted’ ” (Jarrett v Madifari, 67 AD2d 396, 404 [1st Dept 1979]). The party who has the burden of proof must convince the fact finder that the existence of the fact is more probable than its nonexistence. (In re Winship, 397 US 358, 371 [concurring opn]; United States v Mastrangelo, 561 F Supp 1114, 1119, affd 722 F2d 13, cert denied 467 US 1204; see also, Fisch, Evidence § 1090 [2d ed]; Richardson, Evidence § 97 [Prince 10th ed].)
At bar, defendant has established by a preponderance of the credible evidence that the prosecution conveyed a plea offer to trial counsel. (See defendant’s exhibits A and B.) Former Assistant District Attorney Rothman testified that his bottom line offer would have been an A-II felony, and the note written by James Randolph contained the statement "A-2 plea to cover.” (Defendant’s exhibit B.) All of the above establishes by a preponderance of the credible evidence that an A-II. offer was made.[9]
*583 There are no reported decisions in New York concerning an attorney’s alleged failure to convey a plea offer. At bar, the People have argued that defense counsel has no duty to explore the possibility of plea bargaining (People v Rose, 57 NY2d 837, 839), and therefore the failure to communicate a plea offer does not constitute ineffective assistance of counsel. In People v Rose (supra, at 839), the Court of Appeals stated that defense counsel’s failure "to explore the possibility of plea bargaining” was not error.[10]
In this case, however, a plea offer was made to defense counsel of an "A-2 plea to cover” and the issue is whether counsel has an affirmative duty to inform his client of the offer, and if so, whether the failure to do so constitutes ineffective representation.
There is no precise definition of what constitutes ineffective assistance of counsel. The Federal standard requires a two-part analysis: (1) whether counsel’s performance was deficient and (2) if deficient, whether it prejudiced defendant. (Strickland v Washington, 466 US 668, 687.)
The New York standard was articulated in People v Baldi (54 NY2d 137). "So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met” (supra, at 147).* [11]
A number of cases have held that one egregious error by the trial attorney may constitute ineffective assistance of counsel. (See, e.g., Kimmelman v Morrison, 477 US 365; People v Jenkins, 68 NY2d 896; People v Roy, 122 AD2d 482 [3d Dept 1986].)
In Strickland v Washington (466 US 668, 688, supra), the Supreme Court stated: "Representation of a criminal defendant entails certain basic duties. Counsel’s function is to assist the defendant * * * From counsel’s function as assistant to the defendant derive the overarching duty to advocate the *584 defendant’s cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.” (Emphasis added.)
The American Bar Association Standards for Criminal Justice standard 4-6.2 (a) (2d ed 1980) provides: "In conducting discussions with the prosecutor the lawyer should keep the accused advised of developments at all times and all proposals made by the prosecutor should be communicated promptly to the accused.”
The Code of Professional Responsibility EC 7-7 (1979) states: "In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own. But otherwise the authority to make decisions is exclusively that of the client * * * A defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable * * * but it is for the client to decide what plea should be entered” (emphasis added; see also, EC 7-8).
In Jones v Barnes (463 US 745, 751), the Supreme Court stated: "It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal”.
Every court that has considered the issue outside of New York State has concluded that a plea offer which is not communicated to defendant by his counsel deprives the former of the effective assistance of counsel. (See, e.g., Caruso v Zelinsky, 515 F Supp 676 [Dist Ct NJ 1981]), vacated and remanded on other grounds sub nom. United States ex rel. Caruso v Zelinsky, 689 F2d 435 [3d Cir 1982]; United States ex rel. Simon v Murphy, 349 F Supp 818 [ED Pa 1972]; Lyles v State, 178 Ind App 398, 382 NE2d 991 [1978]; People v Ferguson, 90 Ill App 3d 416, 413 NE2d 135 [1980]; People v Whitfield, 40 Ill 2d 308, 239 NE2d 850 [1968]; State v Simmons, 65 NC App 294, 309 SE2d 493 [1983]; Hanzelka v State, 682 SW2d 385 [Tex App 1984]; Tucker v Holland, 327 SE2d 388 [W Va 1985]; State v Ludwig, 124 Wis 2d 600, 369 NW2d 722 [1985].)
In People v Whitfield (supra) the Illinois Supreme Court reversed a murder conviction based upon counsel’s failure to communicate to defendant an offer of a plea to a lesser *585 charge. The court stated (supra, 40 Ill 2d, at 311, 239 NE2d, at 852): "A defendant has the right to decide whether to appeal or not to appeal * * * as well as the right to decide whether to plead not guilty * * * These rights and others go beyond trial strategy. It follows logically that if a defendant has the right to make a decision to plead not guilty, he also has the right to make the decision to plead guilty. Due process demands this protection. It was his choice, not that of his counsel or his mother.”
The above-noted decisions and standards convincingly demonstrate that once a plea offer has been made by the prosecution to defense counsel the latter must communicate such offer to the accused. Counsel’s failure to inform an accused of the possibility that lesser punishment is available — despite an assertion of innocence — deprives the accused of his or her fundamental right to make the ultimate decision affecting his or her case.[12]
Such failure, in my opinion, is conduct which falls below the objective level of reasonable professional judgment (see, Strickland v Washington, 466 US 668, 688, supra) and constitutes ineffective assistance of counsel.
Accordingly, if the plea offer made to Mr. Siegal was not in fact communicated to defendant herein, I find that defendant would have been denied the effective assistance of counsel. (See generally, Strickland v Washington, supra; People v Baldi, 54 NY2d 137, supra.)
As previously noted, the defendant must establish by a preponderance of the evidence the fact that the plea offer was not communicated to him.
The defendant relies upon the following factors in support of his contention that the plea offer was not conveyed to him: (1) his own testimony; (2) Mrs. Alexander’s testimony; (3) his letter to Mr. Siegal dated March 16, 1982, and the lack of a response to it; (4) defendant’s pro se 440 motion which was turned over to Warren Replansky before Herbert Siegal’s death; (5) James Randolph’s testimony regarding Mr. Siegal’s *586 reaction to the fact that Gene Blocker took a plea; and (6) the lack of any documentary evidence disproving defendant’s claim either from the District Attorney’s files or the court files.
I have carefully considered all of the above factors and find that the defendant has not established by a preponderance of the credible evidence that Mr. Siegal did not communicate to him the prosecution’s plea offer.
Mr. Siegal represented defendant over a two-year period before trial commenced on the subject indictment. During that period defendant, as previously noted, had four open indictments. In former Assistant District Attorney Rothman’s letter to Mr. Siegal, dated August 28, 1975, Mr. Rothman wrote "please be informed that the offer made to you at the last conference was made in ignorance of the legal strength of said Jersey wiretap, and will probably not be available subsequent to the Justice’s ruling.” (Defendant’s exhibit A.)
Defendant and Mrs. Alexander met with Mr. Siegal on numerous occasions both in court and out of court over the course of two years before trial commenced. I do not believe it more probable than not that there were no substantive discussions regarding the multiplicity of serious accusations pending against defendant. According to defendant, basically nothing of substance was ever discussed other than Mr. Siegal’s optimistic view that the case would be won on the wiretap issue.[13] However incorrect or misguided Mr. Siegal’s apparent belief in the strength of the wiretap issue, that belief is certainly not evidence that he would not inform his client of other developments in the case.
Moreover, defendant was a mature adult, who retained Mr. Siegal in the trial court and throughout the appellate process, from 1974 to 1979. It is unreasonable to infer from this continuing relationship that no substantive questions were ever asked by defendant of Mr. Siegal.
At the hearing, defendant claimed to have little or no knowledge of the facts, evidence and circumstances of the case against him until the time of trial. However, he admitted on cross-examination that at his first meeting with Mr. Siegal at the Bronx House of Detention, Siegal went over the facts with him.
In assessing defendant’s credibility at the hearing, I have *587 considered his assertion of innocence regarding the January 29th sale.[14] Having read the trial transcript and appellate briefs, all of which were introduced in evidence at the hearing, I find the defendant’s denial of culpability objectively unsupportable, based upon the lack of any discernible defense at trial, the recovery on March 16, 1974 of the compelling evidence linking defendant to the January 29th sale, and any meaningful challenge at trial by defense counsel of the People’s evidence.
The defendant also argues that the unanswered letter he wrote Mr. Siegal on March 16, 1982, asking him about the prosecutor’s plea offer (see defendant’s exhibit C), and his pro se 440 motion (defendant’s exhibit F), both prepared before Mr. Siegal died, are probative of the validity of his claim that Mr. Siegal did not convey to him the plea offer. I have carefully considered both contentions and believe they are insufficient to convince me of the validity of defendant’s claim.[15]
The failure to answer or respond to an allegation contained in a letter cannot be regarded as an admission to the truth of the statements contained therein. (See, Richardson Evidence § 223 [Prince 10th ed]; Fisch, Evidence § 793 [2d ed]; see also, Viele v McLean, 200 NY 260; Thomas v Gage, 141 NY 506, 510; Learned v Tillotson, 97 NY 1.)
In Leach & Co. v Peirson (275 US 120, 128), the Supreme Court stated: "A man cannot make evidence for himself by writing a letter containing the statements that he wishes to prove. He does not make the letter evidence by sending it to the party against whom he wishes to prove the facts. He no more can impose a duty to answer a charge than he can impose a duty to pay by sending goods. Therefore, a failure to answer such adverse assertions in the absence of further circumstances making an answer requisite or natural has no effect as an admission.”
Testimony which is not credible because contrary to experience may be considered without evidentiary value despite a *588 lack of contradiction. (People v Garafolo, 44 AD2d 86, 88.) A court is not required to accept testimony as true merely because it is uncontradicted. "This is especially true where the testimony concerns a transaction with a person since deceased.” (58 NY Jur 2d, Evidence and Witnesses, § 974.)
Based upon the evidence adduced at the hearing, and the exhibits received, I find that the defendant has failed to establish, by a preponderance of the credible evidence, that Mr. Siegal failed to inform him of the prosecution’s plea offer.
Accordingly, defendant’s motion to vacate his judgment of conviction upon the ground that he was denied the effective assistance of counsel in the trial court is, in all respects, denied.

. Since both parties fully briefed and argued the issue of ineffectiveness of appellate counsel based upon the law as it then existed (see, People v Ramos, 108 AD2d 209; People v Bachert, 121 AD2d 802), I was prepared to rule favorably upon defendant’s contentions that he was denied the effective assistance of appellate counsel on the following grounds: (1) that counsel failed to provide "meaningful representation” by ineffectively arguing the Trial Justice’s consideration of an open indictment, and (2) by counsel’s total failure to argue excessiveness of sentence (see, Evitts v Lucey, 469 US 387; Strickland v Washington, 466 US 668; People v Gonzalez, 47 NY2d 606; People v Baldi, 54 NY2d 137).

. Indictment 2461/74 was returned on September 30, 1974, the court’s copy did not name the defendant, although endorsed on the back of it is a notation that it superseded 808/74, filed March 28, 1974. Indictment 808/74 named defendant and charged conspiracy in the first degree.

. People’s exhibit 2, CPL 440.10 hearing.

. Defendant’s affidavit dated August 6, 1974, in support of his notice of motion to controvert and suppress, pursuant to CPL 710.20.

. Ms. Caputo was deceased at the time of the hearing.

. It was stipulated that Replansky retained exhibit C until September 11, 1986, when it was sent to Oren Root, Jr., at the latter’s request.

. The materials Replansky sent to Gombiener were:
(1) Alexander’s letter to Siegal dated March 16, 1982 (exhibit C);
(2) Rothman’s letter to Siegal (exhibit A); and
(3) A pro se 440 motion prepared by Charles Alexander arguing that Siegal’s failure to convey a plea offer constituted ineffective assistance of counsel. The pro se 440 motion itself was admitted into evidence as defendant’s exhibit F.

. Siegal usually indicated to the client Randolph’s background as chief of narcotics in the Bronx County District Attorney’s office.

. Defense counsel candidly conceded that the proof established nothing *583 less than an A-II felony offer. The minimum sentence available if the defendant had pleaded guilty to an A-II felony was six years to life. If an A-III felony was offered the minimum sentence would have been one year to life.

. The People’s right to withdraw an offer is not in issue. (Cf., Mabry v Johnson, 467 US 504.)

. In People v Benn (68 NY2d 941, 942), the Court of Appeals did not reach the People’s argument that Strickland’s prejudice test should be adopted.

. Plea bargaining is an essential part of the criminal justice process. (Santobello v New York, 404 US 257.) Most cases in the criminal justice system are disposed of by plea. "The disposition by plea satisfies a variety of interests of the administration of justice as a whole as well as of the defendant.” (American Bar Assn Standards for Criminal Justice commentary to standard 4-6.1 [2d ed]; see also, People v Roy, 122 AD2d 482 [failure to place plea bargain on the record deprives defendant of effective assistance of counsel].)

. The wiretap issue was urged by Mr. Siegal as the principal issue on appeal and on collateral attack in the Federal court.

. There is no reason why Simmons v United States (390 US 377) should not be applicable to a CPL article 440 hearing.

. Mrs. Alexander was deeply involved over the two-year period in her husband’s case. Apparently she met with Mr. Siegal as often as the defendant did. I attach some weight to the fact, that after defendant discovered Rothman’s letter, there is no evidence of any attempt by Mrs. Alexander to contact or see Mr. Siegal. It will be recalled that Mrs. Alexander picked up from Mr. Siegal the box containing the letter in question.