Opinion
 

 EPSTEIN, J.
 

 In the published portion of this opinion we conclude that a defendant in a criminal proceeding, who becomes indigent after retaining defense counsel, is not necessarily denied effective representation by reason of a trial court decision not to accord appointed status to his counsel in order to assure that the attorney is paid. We do this in the context of attorneys who are willing to serve, and clients who do not seek their discharge or replacement. We also decide that the bodily harm provision of the aggravated kidnapping statute (Pen. Code, § 209, subd. (a))
 
 [1]
 
 is not unconstitutionally vague, and that the punishment of life imprisonment without possibility of parole for aggravated kidnapping with bodily harm does not violate proscriptions against excessive punishment. Other issues peculiar to the case are determined in the unpublished portion of this opinion.
 

 
 *31
 
 Procedural Summary
 

 The appellants, Refugio B. Castillo, Carlos Ramirez, Jose Garcia and Byron Mendizaval, together with a fifth defendant, Jorge Cardoza, were charged with several counts of aggravated kidnapping with bodily harm, and conspiracy. Cardoza was acquitted on all charges; the other appellants appeal from their several convictions.
 

 The information alleged the kidnapping of two persons, Luis Freddy Ospena Suarez (referred to in the record and here as Suarez), and Adolfo Monsalve Castaño (Monsalve).
 

 Counts I and II related to the kidnapping of Suarez. They alleged, respectively, kidnapping for ransom and for robbery. Each alleged that the victim suffered bodily harm, that a principal was armed with a firearm in the commission of the offense (§ 12022, subd. (a)(1)), and that each defendant was personally so armed (§ 12022.5, subd. (a)). Counts III and IV repeated the allegations of the first two counts, but related to the kidnapping of Monsalve. The final count, V, alleged conspiracy to commit the crime of aggravated kidnapping (§§ 182, subd. (a)(1) and 209, subd. (a)).
 

 The case was tried to a jury, which convicted each appellant of kidnapping Suarez for ransom as alleged in count I. The jury found the bodily harm and armed principal allegations to be true, and found that appellant Garcia was personally armed with a firearm in the commission of the offense.
 

 Appellants were found not guilty of kidnapping Suarez for robbery, as alleged in count II. They were convicted of lesser included offenses to that count: simple kidnapping (§ 207), and robbery (§ 211). All but appellant Mendizaval also were convicted of false imprisonment (§ 236). The armed principal allegation was found to be true, and appellant Garcia was found to have personally used a firearm in the commission of the offense.
 

 Appellants also were acquitted of the crimes alleged in counts III and IV, concerning the kidnapping of Monsalve. But each was convicted of the lesser crime of simple kidnapping and, with respect to count IV, of robbery. As with the other counts, the jury found that a principal was armed and that Garcia had personally used a firearm in the commission of the crime.
 

 Each appellant also was convicted of conspiracy, as alleged in count V.
 

 At sentencing, the trial judge applied the principles of section 654, relating to multiple punishment, and section 669, relating to consecutive
 
 *32
 
 sentencing. As a result, each appellant was sentenced to life imprisonment without possibility of parole, as authorized by section 209, subdivision (a) for kidnapping for ransom with bodily harm. Additional consecutive terms were added: seven years for Castillo (one year for armed use by a principal on count I, and six years for other counts); nine years for Garcia (two years for personal use on count I, and seven years for the other counts); one year for Ramirez (for armed use by a principal on count I); and one year for Mendizaval (also for armed use by a principal on count I).
 

 Factual Summary
 

 In reviewing the factual issues presented on appeal, we consider all evidentiary disputes to have been resolved in favor of the judgment. (See
 
 People
 
 v.
 
 Johnson
 
 (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255];
 
 Jackson
 
 v.
 
 Virginia
 
 (1979) 443 U.S. 307, 318 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].) We present a general summary of the facts at this point, reserving a discussion of particular facts for fuller treatment in our discussion of the issues to which they pertain.
 

 The record reflects the brutal kidnapping of two persons for ransom, their captivity, the release of one of them in an effort to aid in the extraction of ransom for the other, two ransom payments (one real and one feigned), and the recapture of the remaining kidnapping victim.
 

 1.
 
 The Abduction
 

 The kidnapping occurred on the morning of Friday, November 20, 1986, in Los Angeles. The kidnapping victims were Suarez and Monsalve. Both were natives of Colombia, South America. Suarez was employed at an automotive garage located near the Los Angeles County General Hospital. The business was called Little Joe’s, and was owned by Jose Esqueda, an individual who will figure further in the events that followed. Monsalve was seeking employment with Esqueda, and was about to start working with paint at his establishment.
 

 Suarez and Monsalve had come downstairs from the apartment they shared, planning to do some laundry and then go to work at the garage. Suarez was already in his car when a white van suddenly appeared in die driveway behind his vehicle. Monsalve saw the van approach as he was coming out of the stairway. Four armed men exited the rear of the van. One told Monsalve, “Do not move, bastard.” Monsalve was forced into the van, where he was kicked, struck with the butt of a gun, taped and handcuffed. A blanket was thrown over his head.
 

 
 *33
 
 One of the men pointed a shotgun at Suarez; he was ordered into the van. Once there, he was struck hard behind his left ear and thrown onto the floor. His hands were handcuffed behind him and handcuffs also were placed on his ankles. Suarez’s rent money was then taken from his person, and he was placed facedown on the floor of the van and covered with a blanket.
 

 Although faint from the attack, Suarez could hear four voices. He recognized one of them as Mexican and the other three as Peruvian.
 

 2.
 
 The Trip
 

 The van then left the place of abduction. During the ride, which lasted almost an hour, Suarez was stripped of his clothes, and his abductors threatened to rape him unless he gave them money. The battering that he had suffered before the van left was continued during the trip. Suarez was struck on both sides of his face and on his jawbone. He also was hit all over his body. Some of the blows were inflicted by kicking, and some by an object such as a stick or a shotgun. This was the beginning of a prolonged ordeal during which Suarez was repeatedly beaten. By the time of trial, in 1987, he had undergone knee surgery which he related to the beatings, and still had trouble with some movements.
 

 During the trip, the abductors spoke of money and told Monsalve and Suarez that they would be killed and their bodies thrown in the desert. Monsalve was told that the abductors had come to collect a debt owed by Suarez.
 

 When the van finally stopped, a watch, house keys and money were taken from Monsalve. Another person entered the van, and, speaking with a Peruvian accent, said that he wanted a lot of money, and that he was going to kill Suarez. He proceeded to kick Suarez.
 

 3.
 
 The Captivity
 

 Monsalve and Suarez were held inside the van at the place where it stopped for about five hours. Monsalve was allowed to relieve himself outside the vehicle; Suarez was not permitted that amenity. Monsalve also was given something to eat; Suarez was not. Monsalve eventually was taken from the van into a house, where he was placed inside a closet. He was kept there for four to five days, allowed out of the closet only to use the bathroom. While in this captivity, he heard the names Luis, El Loco, Jorge and El Chino. He also heard a woman’s voice asking for Luis.
 

 
 *34
 
 After four to five days, Monsalve was taken back into the van and transported with four other occupants to the vicinity of 6th and Alvarado in Los Angeles. Before being released at that location, he was told that he would be given Suarez’s papers, telephone book and documents (evidently these had been taken from the victims’ apartment during their captivity), with the explanation that he was being given these items to enable him to call and obtain $80,000 or four kilos of cocaine as ransom for Suarez’s release. Monsalve was told that he would be contacted at the body shop.
 

 Suarez was held in the van for a day and a half. He was blindfolded all of that time, and was able to keep track of the time by the radio, which his captors played loudly. He was finally taken into the house, where he was kept in a closet. For several days, he was not allowed to use a bathroom or to sleep on a mattress. He was kept inside the house for the remainder of his captivity, and was beaten, hit or kicked almost every day. He was taken from the house only to call Esqueda to ask that he be ransomed and, at the end, in an effort by his kidnappers to evade capture.
 

 4.
 
 The Ransom Payment
 

 Some two or three days after Suarez had failed to report for work, and before Monsalve’s release, Esqueda received a telephone call in which the caller asked for money in exchange for Suarez’s release. Esqueda thought this was a joke and hung up. But he then received a series of similar calls in which the callers asked for $18,000 or $18,500 for Suarez.
 

 In the meantime, Luz Gomez, a former girlfriend of Suarez, received information from Suarez’s landlord that caused her to go to Esqueda’s garage. She was there when Esqueda received a call, and listened on another line. The caller told Esqueda that he was not playing around, that he had Suarez and Monsalve and wanted money to let Suarez go, because Suarez owed money. Eighteen thousand dollars or $18,500 was demanded.
 

 At some point during his captivity, Suarez was taken in a car and driven 30 to 40 minutes. When the vehicle came to a stop, Suarez was taken out, blindfolded, and handcuffed to a telephone. He was told that he would be killed if he screamed. Esqueda was on the line, and Suarez, then crying, asked him to help because his captors meant business.
 

 Esqueda also received a call from someone who said that he would bring some money for Suarez. Late one afternoon, a man came into the garage with a bag that he said contained $8,000. He handed it to Gomez, who gave it to Esqueda. Neither looked inside the bag. Esqueda already had received instructions to deliver what he received at a restaurant in West Hollywood.
 

 
 *35
 
 Late that afternoon, Esqueda and Gomez drove to the restaurant in separate cars. Gomez went into the rest room, where she stayed for about 10 minutes, while Esqueda waited in his car. He noticed a blue Datsun or Toyota wagon pass and stop close to the car. The occupants looked at him, then drove away. He also noticed a motorcycle parked behind him. Then someone put a bag over his head, and told him that if he moved they would blow his head off. He was asked to hand over the money, and he handed the package through the open car window. Esqueda was commanded to wait five minutes. He waited a short time, then met Gomez in the lobby of the restaurant, and left.
 

 Later, Esqueda identified defendant Garcia as the person on the motorcycle, defendant Cardoza as the driver of the blue car, and defendants Ramirez and Castillo as passengers in the car.
 

 5.
 
 The Feigned Ransom Payment
 

 Two or three days after the episode at the West Hollywood restaurant, Esqueda received a telephone call asking for $80,000 in exchange for the release of Suarez and Monsalve. He told the caller that he could not raise that sum. The caller told him that he had one week within which to do so, or that Suarez and Monsalve would be killed.
 

 Later the same day, Esqueda received another call. The caller put Suarez on the line. Suarez was crying, and told Esqueda not to let him be killed, but to try to raise the money. Esqueda said that he was doing the best he could, that it was hard to raise $18,000, and that the demand had risen to $80,000. The telephone call was then terminated.
 

 Monsalve was released the same day. The next day he went to Esqueda’s garage and told him what had happened. He asked Esqueda for help. Esqueda told him that he was trying to sell his shop to raise money, because it was hard to let someone be killed.
 

 Monsalve received telephone calls at the garage, and then went to a pay telephone some two blocks away where he received another call. When that call came in, Monsalve recognized the voices as those of the persons who had spoken to him before he was set free. In the call, Monsalve was told that Suarez’s life depended on him, and that he would receive another call at 8 o’clock that morning.
 

 That call was made, and Monsalve was asked if he had obtained the money. He replied that Esqueda was trying to sell his garage to raise it. Monsalve was told that he would be given until Saturday (apparently, Nov.
 
 *36
 
 28,1987) at 5 p.m. to raise the money, and would be instructed about how to deliver it.
 

 The next day (Friday, Nov. 27,1987), when Esqueda was unable to sell his garage, Monsalve decided to go to the police. He did so, accompanied by Gomez, who had an excellent command of English. The police took a full report from Esqueda, Monsalve and Gomez.
 

 On Saturday, November 28, 1987, Monsalve was wired for sound and given a dummy money package. When he received a prearranged telephone call at the public telephone the callers had been using, he told them that he only had been able to raise $40,000. The callers instructed him to drive his red Datsun to a parking lot at Sunset and Virgil, to place the money and the keys in the backseat, and leave. The police told Monsalve to leave the car as instructed, and then call the police from a public telephone.
 

 Monsalve went to the parking lot and left the car and the dummy money package, as instructed. He left the area and called the police, who picked him up 20 to 30 minutes later.
 

 Other officers had been watching the parking lot. They saw a brownish LTD arrive five to ten minutes after Monsalve left his vehicle. One person left the LTD, went over to Monsalve’s vehicle, got inside, reached into the rear passenger compartment, and exited. He returned to the LTD and got into the right passenger seat. The LTD began to back up. Then the passenger got out and started running through the parking lot. Officers pursued him and ordered him to stop. The passenger stopped, and was seen to have a handgun in his right hand. A pursuing officer again yelled at him, and the passenger began pointing the gun in the officer’s direction. At that point other officers fired at the passenger, killing him.
 

 In the meantime, other officers had blocked the LTD. Castillo was in the driver’s seat, and was arrested. A loaded 9-mm semi-automatic, fully cocked weapon was found outside the open passenger door of the car. The dummy ransom package was not recovered.
 

 6.
 
 The Rescue
 

 In response to questions, Castillo directed police officers to a residence in Valinda. Castillo told them that Suarez was being held in the first bedroom on the right. The house had been leased to Cardoza and Marina Maldonado. They told the lessors that a cousin named Jorge or Jose Quezada or Borga would be living with them.
 

 
 *37
 
 At the residence, the officers saw a car in the driveway, and a motorcycle parked in front. Garcia was seen to exit the residence, holding what looked like a revolver. He got inside the vehicle, and drove off. Officers followed him to the entrance of a nearby market, where he exited and walked to a telephone booth in front of the market. Two officers walked by the vehicle Garcia had just left. They saw a .22 revolver on the front seat, and then arrested Garcia. The revolver was fully loaded.
 

 Some 15 minutes after Garcia left the Valinda residence, other officers saw Ramirez enter that house. Ramirez came out to the front yard, then went back inside.
 

 Two persons, who spoke like Peruvians, moved Suarez to the van, which was in the garage of the house. They moved quickly, and said “There they are, there they are, the police.” Suarez was thrown inside the van, blankets were thrown on top of him, and he was told that he would be killed if he moved. The men also told him that they were going to take him to the desert and kill him.
 

 Cardoza opened the garage door from the inside, walked onto the driveway, and looked around. The garage lights allowed police to see the van with two persons in the front seat. Ramirez was the driver and Mendizaval the passenger. Cardoza walked to the driver’s side and appeared to have a conversation with the van’s occupants. The van then pulled onto the street, went to the corner, turned, and stopped. The interior lights of the van then went on, and some movement was seen in the front part of the van.
 

 The van was pursued by police who had activated red lights and sirens. It went into a parking lot and crashed into a parked car. Mendizaval got out before the van stopped, and jumped over a retaining wall. He was struck by a sheriff’s vehicle, rolled up against the windshield, fell down, got up, and resumed his flight. A detective ordered him to stop, but he continued running until he ran into a building and was taken into custody.
 

 Ramirez, the driver, also got out of the van before it crashed to a stop. He ran along the front of the market into an open field. Threatened by a pursuing officer, he finally stopped and was taken into custody. Five shotgun shells were found in his jacket pocket.
 

 Another officer looked inside the van, removed the blanket and found Suarez. Suarez’s mouth was taped and his hands were handcuffed behind his back. He was shaking and crying, and obviously afraid. A shotgun, a semiautomatic rifle, and a .22 Derringer revolver also were found inside the van. The shotgun shells taken from Ramirez’s jacket fit the shotgun. Bullets
 
 *38
 
 of .22 caliber were found on Mendizaval. Handcuff keys were found on Castillo’s person.
 

 When Suarez returned to his apartment after his release, he found that everything was broken. He never saw his vehicle again.
 

 7.
 
 Physical Examination of Suarez
 

 Suarez was examined at a hospital emergency room on the morning after his release. Dr. Kirk Jensen, the examining physician, observed Suarez to have been severely bruised. Dr. Jensen testified that Suarez had sustained multiple injuries from a variety of causes, and that the injuries were consistent with Suarez’s history of repeated assaults to various parts of his body during his captivity. The injuries were not trivial, but were moderate to severe. Dr. Jensen concluded that Suarez had suffered severe contusions to his back, chest, and legs.
 

 8.
 
 The Identification
 

 Suarez recognized a particular individual as the one who instructed him what to say on the telephone. That person spoke to him more than did any of the others. He also assaulted Suarez. Suarez identified Garcia as that individual. He had seen Garcia’s face for a few seconds when he was kidnapped.
 

 Suarez attended five lineups on December 11, 1986. Each lineup consisted of six persons. Suarez recognized only one person from these lineups: Garcia. He identified Garcia by his voice, and by his “color.” He recognized him when he came in, because “[t]hat face cannot be forgotten.”
 

 Esqueda also attended lineups. He was able to identify Ramirez, Mendizaval and Garcia (although he was unable to identify Mendizaval at trial).
 

 Monsalve attended five lineups, and also was able to identify only one person: Castillo. Monsalve explained that he had once lifted the tape from his eyes and had seen Castillo. He also recognized Castillo’s voice.
 

 Issues Presented
 

 We have arranged the issues raised by appellants into five broad groups.
 

 The first concerns effective representation by counsel, and includes arguments by appellants Ramirez and Garcia concerning the requests that their counsel receive court appointments, as well as other claims of ineffective
 
 *39
 
 assistance raised by appellants Garcia and Mendizaval. (Subparts A and B of these issues, concerning status of counsel and conflict of interest, are published; subpart C, concerning specific claims of ineffective representation, is not.)
 

 The second group (in which our opinion is not certified for publication) concerns claims of error in the receipt or exclusion of evidence, raised by appellants Castillo and Garcia.
 

 The third group of issues concerns the bodily harm allegations, and includes a claim by appellant Garcia that the relevant statutory provision is unconstitutionally vague, arguments by appellant Ramirez concerning jury instructions on bodily harm, and a claim by appellant Mendizaval that the evidence of bodily harm is insufficient. (In this group, we publish only our discussion of the vagueness issue.)
 

 The fourth group of issues (also not published) concerns allegations of prosecutorial misconduct raised by appellant Castillo.
 

 The final group consists of claims of sentencing error. Appellants Ramirez and Mendizaval argue that their life sentences are unconstitutionally excessive, and appellant Garcia challenges multiple personal armed use enhancements. (Here, we publish only our discussion of the constitutional challenges.)
 

 Pursuant to California Rules of Court, rule 13, appellants Garcia and Mendizaval also join in the arguments of other appellants that are helpful to them.
 

 Finding no prejudicial error, we affirm the convictions.
 

 I
 

 Effective Representation by Counsel
 

 A.
 
 Status of Counsel
 

 Appellants Ramirez and Garcia each claim error from the fact that their respective retained counsel were required to proceed to trial without a realistic likelihood that they would be paid for their services. Each attorney had been privately retained by his client; each expected that his fee would be paid by relatives of the client; and each learned shortly before trial that there was little or no prospect that further payments would be made.
 

 
 *40
 
 At that point, Ramirez’s attorney moved to be relieved, with a request that he be appointed pursuant to section 987.2.
 
 [2]
 
 His motion was denied. Shortly after that, counsel for Ramirez and Garcia each asked the court to exercise its discretion to appoint them under section 987, subdivision (a); these requests also were denied. On appeal, Ramirez and Garcia argue that the trial court abused its discretion in denying their motions to appoint their counsel under section 987, subdivision (a) and that, as a result, their attorneys were forced to choose between expending the effort required to present an effective defense and pursuing other, more remunerative work for other clients. They claim that this resulted in a conflict of interest which violated their constitutional right to effective representation by counsel.
 

 We conclude that there is no cognizable conflict of interest, and that neither Ramirez nor Garcia was denied effective assistance of counsel on any of the grounds asserted.
 

 1.
 
 The Court Hearings
 

 At all pertinent times, appellant Garcia was represented by attorney Edward Lopez. Appellant Ramirez originally was represented by attorney Frank Morales, who was paid $3,000 for his services at the preliminary hearing. Morales was succeeded by attorney Charles Maple, who made an appearance at the preliminary hearing and was the sole counsel for Ramirez at the superior court proceedings.
 

 All defendants were arraigned in superior court on June 30, 1987. Following pretrial proceedings and numerous delays, a continued trial date of September 8, 1987, finally was established. On that date, Mr. Maple announced ready for trial and, following a discussion between the court and counsel about various trial-related matters, made an oral request to withdraw as attorney for Ramirez. Mr. Maple explained the reasons for his request: when he was retained, he was told that money to pay for Ramirez’s defense would be coming from family members in Lima, Peru, but problems had arisen and the money was not being paid. Mr. Maple had been paid $2,500-$3,000, an amount he thought was “an insufficient sum to guarantee adequate defense in this matter.” The court asked Mr. Maple how long he had been aware of the problem. He responded that he had known about it for four weeks, but the issue had come to a head just four days before in a conversation with Ramirez’s spouse. Mr. Maple asked that the trial court
 
 *41
 
 relieve him from his responsibilities as retained counsel, and then appoint him to represent Ramirez.
 

 The court observed that all counsel, including Mr. Maple, had announced ready for trial on this, the trial date, and denied the motion. Garcia’s attorney was present throughout this discussion, but said nothing about being relieved or about a court appointment.
 

 The attorneys estimated the time to try the case as between three weeks to two months. The court trailed the case to another department for trial, which was to begin on Thursday, September 10, 1987.
 

 The record shows that on September 10 the new trial judge conferred with counsel about a possible disposition and other matters. The case was then trailed to the following Monday, September 14. On that date, Mr. Maple again raised the problem of his compensation for representing Ramirez at trial. He stated that he was ready to go to trial, and was not seeking a delay. He also acknowledged that he had been retained to represent Ramirez at trial. The retainer agreement called for a payment of $2,500 at an hourly rate of $125, with the understanding that any work in excess of 25 hours would be compensated at the rate of $100 an hour. Periodic payments were to be made to Mr. Maple by Ramirez’s family in Lima. Substantial initial payments had been made, but the payments then diminished in amount, although Ramirez’s wife continued to assure Mr. Maple that they would be brought up to date. Mr. Maple eventually received a further payment, bringing the total payments to him to $2,800. That was almost a month before the hearing, and Mr. Maple had received nothing since that time. A short time before the hearing, Mrs. Ramirez had said that another $4,000 might be forthcoming, but that it would take one to two weeks; so far, it had not been paid. Mr. Maple had told her that he intended to honor his pledge to the court to be ready for trial whether he was paid or not, and that he would proceed to trial. Mr. Maple asked the court to appoint him to represent Ramirez, and he agreed to turn over any further payment he might receive from the Ramirez family to the court.
 

 Appellant Garcia’s lawyer, Mr. Lopez, joined in Mr. Maple’s argument and also requested an appointment. He pointed out that he was the only defense counsel to have been in the case from the beginning. His retainer arrangement called for payment of $15,000 for the preliminary hearing phase of the case, and for a payment of $75,000 more if the case went to trial. Mr. Lopez was told that a brother of his client would be making the payments. Apparently, the payment for the preliminary hearing had been made, but Mr.
 
 *42
 
 Lopez had been informed by his client a few weeks before the hearing that the brother had disappeared, and that the family was unable to pay him.
 

 The trial court evidently had been informed of the payment problems by counsel for Ramirez and Garcia before the in-court hearing, as arrangements had been made to appoint another attorney, Dennis Fischer, to address the court on the issue and to pursue writ review if necessary. Mr. Fischer argued that an appointment was necessary in order to assure effective representation for Ramirez and Garcia. He argued that whatever the rights and obligations of those parties under their retainer agreements, there are attorneys who would refiise to work in this situation unless they were paid. He acknowledged that both Ramirez and Garcia had faith in their respective attorneys and wanted to keep them, but that this should not alter the result he was seeking: that the attorneys should be appointed by the court so that they could be compensated by the county for their continued representation.
 

 The trial court specifically found that both attorneys were acting in good faith and honorably, and were not seeking to delay the case. The court also expressed its view that both were fine trial lawyers and, in response to the suggestion that a client’s Sixth Amendment right to effective representation might be diminished if counsel were not paid, stated that “it shall not be by these lawyers, I guarantee you that.”
 

 In the end, the court found the issue to be difficult, but concluded that an appointment was not appropriate because each attorney had agreed to look to his respective client (or the client’s family) for payment. It was the court’s view that if it were to make the requested appointments, the court itself would be acting as a guarantor of bad debts. The court denied the motions to appoint counsel for trial, appointed Mr. Fischer to seek appellate review of that ruling on behalf of Ramirez and Garcia, and trailed the case to the next day for trial.
 

 A petition for mandate to direct the trial court to appoint Mr. Maple to represent Ramirez was filed with the Court of Appeal on November 13, 1987, and was denied on November 19,1987. (The parties stipulated that the ruling on the writ would apply to Garcia as well as Ramirez.) In the meantime, jury selection began as scheduled, on September 15, 1987.
 

 2.
 
 Claim of Abuse of Discretion
 

 Section 987, subdivision (a) requires that, in a noncapital case, “if the defendant appears for arraignment without counsel, he shall be informed by the court that it is his right to have counsel before being arraigned, and shall
 
 *43
 
 be asked if he desires the assistance of counsel. If he desires and is unable to employ counsel the court shall assign counsel to defend him.” The right to be represented by counsel at a criminal trial is fundamental
 
 (Gideon
 
 v.
 
 Wainwright
 
 (1963) 372 U.S. 335, 340 [9 L.Ed.2d 799, 802-803, 83 S.Ct. 792, 93 A.L.R.2d 733]), and, as such, it requires appointment of counsel when an attorney is permitted to, or is required to withdraw at a post-arraignment stage of the proceedings. (See, e.g.,
 
 People
 
 v.
 
 Lucev
 
 (1986) 188 Cal.App.3d 551, 556 [233 Cal.Rptr. 222].)
 

 This statute is part of a broad legislative system for compensation of attorneys who are appointed to represent indigent defendants in criminal proceedings, and in certain other cases. It reflects a state policy to provide for such compensation. (See
 
 Luke
 
 v.
 
 County of Los Angeles
 
 (1969) 269 Cal.App.2d 495,497 [74 Cal.Rptr. 771];
 
 Marks
 
 v.
 
 Superior Court
 
 (1966) 245 Cal.App.2d 779, 784 [54 Cal.Rptr. 169] [statutory history of provisions]; cf.
 
 Cunningham
 
 v.
 
 Superior Court
 
 (1986)
 
 177
 
 Cal.App.3d 336, 347 [222 Cal.Rptr. 854] [“impressment” of attorney to perform
 
 pro bono publico
 
 work without compensation violates equal protection rights].) Nevertheless, “[i]n the absence of statutory authorization, it has long been settled in this state that an attorney is not entitled to compensation for services rendered in acting in the defense of indigent criminal defendants.”
 
 (Arnelle
 
 v.
 
 City and County of San Francisco
 
 (1983) 141 Cal.App.3d 693, 696 [190 Cal.Rptr. 490] [action at law does not lie for attorney who is dissatisfied with compensation awarded by court];
 
 County of Los Angeles
 
 v.
 
 Superior Court
 
 (1980) 102 Cal.App.3d 926 [162 Cal.Rptr. 636] [no power to compensate appointed counsel in civil case absent statutory authorization].)
 

 Where, in a litigation matter, a retainer agreement calls for an attorney to be paid particular amounts at specified times, and there is a failure to pay when due, the attorney has a remedy; it is to ask to be relieved from the duty of further representation of the client. (Code Civ. Proc., § 284, subd. 1.)
 
 [3]
 
 This provision is applicable to criminal matters as well as to civil litigation.
 
 (Smith
 
 v.
 
 Superior Court
 
 (1968) 68 Cal.2d 547, 558 [68 Cal.Rptr. 1, 440 P.2d 65].) “Having undertaken the defense of a criminal case, an attorney must continue with his services until he is released by the client or by the court; he may apply to the court for release from further service and for good cause shown may be released, but he may not abandon his representation at will, nor for considerations personal to himself.”
 
 (People
 
 v.
 
 Murphy
 
 (1973) 35 Cal.App.3d 905, 921 [111 Cal.Rptr. 295].) If an application for release is denied, the attorney may, of course, apply for appellate
 
 *44
 
 review of the order denying the application. (See
 
 In re Jackson
 
 (1985) 170 Cal.App.3d 773, 781 [216 Cal.Rptr. 539];
 
 People
 
 v.
 
 Murphy, supra,
 
 35 Cal.App.3d at p. 921.)
 

 In this case, only Ramirez’s attorney asked to be relieved, and that request was made only once, by oral application on the date set for trial of the case. On that date, September 10, 1987, the trial judge observed that counsel (Mr. Maple) had pronounced himself ready for trial, and denied the motion. Given those circumstances, we cannot say that the trial court abused its discretion.
 

 The issue of compensation was revisited a few days later, on September 14, 1987, the date to which the case had been trailed for trial before another department of the court. On that occasion, the attorneys for both Ramirez and Garcia asked that their status be changed from retained to appointed counsel so that they could be paid for their services. Neither attorney sought to walk away from the case, as he might have done by asking that he be relieved
 
 unless
 
 he received a section 987, subdivision (a) appointment.
 

 It is plain from a reading of the record of this proceeding that the omission of a request to be relieved was not the product of a technical error or oversight. Counsel knew what they were doing, and acted with complete professional propriety. As the trial court observed, neither attorney sought to delay trial or to place his personal situation ahead of the interests of his client. Mr. Maple made it clear that, while he felt that an appointment was warranted, he was going to try the case for his client whether he received one or not. Mr. Lopez, Garcia’s attorney, associated himself with Mr. Maple’s position.
 

 Both attorneys sought only to persuade the court to exercise its discretion to arrange matters so that they could be paid by the county. The court declined to do so. As it saw the problem, counsel had to look to their respective clients or the clients’ families for payment, and an appointment would place the court in the position of guaranteeing the “bad debt” of the clients, the principal obligors. It obviously felt that it was not appropriate to place the county in that position. (Cf. Cal. Const., art. XVI, § 6 [prohibition against gift or loan of credit by state or political subdivision].)
 

 It is not entirely clear whether the trial judge believed that he was legally precluded from appointing Maple and Lopez under section 987, subdivision (a), or considered that it was merely inadvisable to do so. If the former, we respectfully disagree. It is a relatively common practice to appoint a retained attorney to represent a client when the client has become indigent and, for
 
 *45
 
 that reason, unable to pay the attorney’s fees, and the public defender is not available. (See
 
 People
 
 v.
 
 Ortiz
 
 (1990) 51 Cal.3d 975, 989 [275 Cal.Rptr. 191, 800 P.2d 547] [recognizing authority of the court to make such appointments]; Cal. Criminal Defense Practice (1991) Criminal Justice System, § 1.12[3], p. 1-30.)
 

 Whether the trial court should have granted the attorneys’ requests—i.e., whether it was an abuse of discretion to deny them—presents a somewhat closer question. Of course, as we have seen, doing so would have entailed the elicitation of a request under Code of Civil Procedure section 284. It seems clear from the record, however, that both attorneys would have presented such requests if they understood that it would have resulted in their receiving appointed status in place of their retained status. And the court made it clear that it intended to resolve the issue on the merits, rather than on technical grounds. We shall follow that approach, and decide the issue on its merits rather than on a technicality.
 

 If error occurred, either because the trial court believed that it lacked discretion it actually possessed or because it abused that discretion, the avenue for relief was the same: by application for extraordinary appellate court review. The trial judge obviously was aware of this, since Mr. Fischer was present and available at the hearing to argue the issue, and received appointment to seek appellate court intervention. As we have related, the application was made, but the relief sought was denied.
 

 In the meantime, Ramirez and Garcia proceeded to trial and to judgment, still represented by their counsel of choice. We see no basis to review the correctness of the trial court’s application of its appointment authority, except as it may bear on the issues of conflict of interest and effective representation, which we next discuss.
 

 The reason is that, at this stage, any error by the trial court is moot unless it can be shown to have resulted in prejudice to Ramirez or Garcia. And whatever the situation of their attorneys in seeking compensation for their anticipated services, the only possible prejudice to Ramirez or Garcia is in the representation they actually received at trial. (Cf.
 
 People
 
 v.
 
 Pompa-Ortiz
 
 (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941] [irregularities in preliminary examination procedure not basis for reversal of ensuing conviction unless defendant “deprived of a fair trial or otherwise suffered prejudice as a result thereof”].)
 

 Before addressing the claims of resulting prejudice, we emphasize that this case is not one in which the court stood in the way of a defendant who wanted to dismiss his retained attorney. That was the situation in
 
 People
 
 v.
 
 *46
 

 Ortiz, supra,
 
 51 Cal.3d 975. The Supreme Court held that the fact that the attorney-client relationship arose out of client selection and a retainer agreement was no reason to deny a timely request by the client-defendant to discharge the attorney. Because prejudice is presumed from a ruling that forces an indigent defendant to proceed with a retained attorney he seeks to discharge, a per se standard of reversal was applied. (51 Cal.3d at p. 988.)
 

 In contrast to
 
 Ortiz,
 
 neither Ramirez nor Garcia sought to discharge his attorney; instead, each wanted to keep the counsel he had. Each had faith and confidence in his attorney, and sought no other representation. The basis for reversal in
 
 Ortiz
 
 is simply not engaged by the facts or circumstances of this case.
 

 B.
 
 Claims of Conflict of Interest
 

 Ramirez and Garcia each argue that the refusal of the trial court to accord section 987, subdivision (a) appointed status to trial counsel forced his attorney to go to trial without a realistic expectation of compensation, and that this circumstance placed the attorney in a position of conflict of interest. The theory is that each attorney was forced to choose between serving the interests of his client at substantial personal expense to himself (because doing so prevented the attorney from using that time in the service of fee-paying clients or other remunerative activity), and spending less time on his client’s case in order to earn money in other cases. Appellants next apply decisions that hold that a denial of the right to representation by counsel is per se constitutional error, precluding examination of actual prejudice and requiring reversal.
 

 Neither premise of this syllogism has merit, and the conclusion advanced is therefore untenable.
 

 It is, of course, true that the right to effective representation by counsel embraces the right to be represented by conflict-free counsel.
 
 (Wood
 
 v.
 
 Georgia
 
 (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097];
 
 People
 
 v.
 
 Bonin
 
 (1989) 47 Cal.3d 808, 834 [254 Cal.Rptr. 298, 765 P.2d 460].) The right itself is indeed fundamental, being “among those ‘constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.’ ”
 
 (Holloway
 
 v.
 
 Arkansas
 
 (1978) 435 U.S. 475, 489 [55 L.Ed.2d 426, 437, 98 S.Ct. 1173].) In a recent discussion of the nature of the right, Chief Justice Rehnquist described the deprivation of counsel to a defendant in a criminal case as a form of “structural defect” so fundamental as to defy harmless error analysis, because it affects the entire conduct of the trial from beginning to end.
 
 (Arizona
 
 v.
 
 Fulminante
 
 (1991) 499 U.S__[113 L.Ed.2d 302, 111 S.Ct. 1246].)
 

 
 *47
 
 Broadly speaking, conflicts of interest “embrace all situations in which an attorney’s loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.”
 
 (People
 
 v.
 
 Bonin, supra,
 
 47 Cal. 3d at p. 835, citing ABA, Model Rules. Prof. Conduct (1983) rule 1.7 and com.)
 

 The most typical conflict situation presented in the reported decisions is that of an attorney who represents two clients with opposing interests. The problem occurs in numerous variations, but all of them have in common the strain of divided loyalty on an attorney who must compromise the rights of one client to better serve another. (See, e.g.,
 
 Holloway
 
 v.
 
 Arkansas, supra,
 
 435 U.S. 475 [classic case of single attorney representing codefendants in criminal trial];
 
 Burger
 
 v.
 
 Kemp
 
 (1987) 483 U.S. 776 [97 L.Ed.2d 638, 107 S.Ct. 3114] [attorney’s partner represented codefendant who was tried later in severed proceedings];
 
 People
 
 v.
 
 Easley
 
 (1988) 46 Cal.3d 712, 729 [250 Cal.Rptr. 855, 759 P.2d 490] [fees of retained attorney paid by person whose premises had been burned by defendant, where that fact was likely to be used as factor of aggravation at penalty phase of capital case].)
 

 A conflict of interest also may arise where all or a portion of the attorney’s compensation is in the form of an assignment of literary rights from the client (see
 
 Maxwell
 
 v.
 
 Superior Court
 
 (1982) 30 Cal.3d 606, 616 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333]), and in many other situations. (See, e.g.,
 
 People
 
 v.
 
 Singer
 
 (1990) 226 Cal.App.3d 23, 37 [275 Cal.Rptr. 911] [romantic relationship between defense counsel and defendant’s wife, which “introduced deception and duplicity into the advocate-client relationship”]; 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, §§2756, 2767, pp. 3327, 3341 [cases collected].) But no California authority, and no national authority cited to us, has held the situation presented in this case to amount to a prohibited conflict of interest.
 

 We briefly discuss the out-of-state authority offered on the issue.
 
 Walberg
 
 v.
 
 Israel
 
 (7th Cir. 1985) 766 F.2d 1071 involved an egregious situation in which a trial judge made it clear to the appointed counsel that his fee in the case at trial and his prospects for future appointments depended on pulling his punches in representing the defendant before the court. The attorney had to choose between conflicting incentives: the interest of his client “to get off by any means, [and that of the attorney] to preserve so far as possible his relationship with a judge who regarded himself, apparently with some basis, as [the attorney’s] benefactor.”
 
 (Id.
 
 at pp. 1074-1075.) Even though there was no proof that the attorney actually pulled his punches, the threats of reprisal by the judge if he failed to do so presented an “extreme case” in which a prohibited conflict was engendered.
 
 (Id.
 
 at p. 1075.) This case might more accurately be classified as one in which judicial misconduct was so
 
 *48
 
 extreme as to negate the fundamental fairness required in a criminal trial. But however the case is classified, it bears no resemblance to the case before us now. There is not a hint in the record of this case of any conduct by the trial judge that threatened or pressured any attorney not to present a vigorous defense for his client.
 

 United States
 
 ex rel.
 
 Simon
 
 v.
 
 Murphy
 
 (E.D.Pa. 1972) 349 F.Supp. 818, is a contingent fee case in which counsel was to be paid only if the client was acquitted. (Apparently, fees were to be paid from insurance proceeds on the life of the client’s husband, whom she was accused of having murdered; payment on the policy depended on the client’s not being convicted of murder.) As a result of the fee arrangement, the attorney had a disincentive against a negotiated disposition of the case and, in fact, was late in communicating an offer by the prosecution and then counselled against its acceptance. The court found that the client would have accepted the offer, which entailed a guilty plea to second degree murder. Instead, she proceeded to trial and was sentenced to death. The court concluded that the attorney had placed his personal interests ahead of the interest of his client.
 
 (Id.
 
 at p. 823.) The attorney stood to gain a fee if his client was acquitted, but would lose compensation if she were not, and he allowed that circumstance to affect his posture in the pretrial negotiations. Our case scarcely resembles these aggravated facts. Neither retained counsel had a financial interest in the outcome of the case, much less a contingent fee that depended upon acquittal, and there is no claim or showing that either attorney failed to communicate or counseled rejection of a plea offer advantageous to his client.
 

 Finally, in
 
 State
 
 v.
 
 Pelfrey
 
 (1979) 163 W.Va. 408 [256 S.E.2d 438], defense counsel ignored a proper basis for mistrial because he did not want to have to try the case again. The appellate court found that, by his action, the attorney placed his own interests ahead of the interests of his client, since the decision of whether to move for mistrial should not be governed by the attorney’s lack of enthusiasm for a retrial. (256 S.E.2d at p. 440.) Again, there is no suggestion that either retained counsel in this case passed up an opportunity to do anything that would have advantaged his client in this lengthy case, merely to get it over or to avoid facing a retrial.
 

 It is true that in each of the out-of-state cases, there was a relationship between the outcome or some action or failure to act by the attorney, and the attorney’s financial situation. Appellants argue that the lesson to be distilled is that whenever the financial interests of the attorney may be affected by the trial, there is a prohibited conflict of interest.
 

 It is not surprising that no case has gone so far, for if appellants’ position were correct, it is difficult to see how any trial in which a defendant is
 
 *49
 
 represented by retained counsel would not be affected. An attorney who agrees to represent a client for a flat fee (as Mr. Lopez did for Garcia in this case) has an arguable interest in ending the trial as soon as possible. The sooner it ends, the less time the attorney will have to expend in trial, and the sooner he or she will be able to handle other work. The attorney would receive the same fee in any case. And an attorney who agrees to represent a client on an hourly basis (as Mr. Maple did for Ramirez in this case) arguably has an interest in prolonging the case. For that matter, the same could be said of appointed counsel who serve on an hourly rate. The argument would be that such counsel have a motivation to drag a case on in order to build up a fee.
 

 The fact is that the adequacy of compensation
 
 simpliciter,
 
 whether it is measured on a flat fee, hourly rate, or some combination of the two, does not create a prohibited conflict of interest between the attorney and the client. In this case, the attorneys received no compensation from public funds at all, and were obliged to look to their clients and their families for compensation, a prospect each credibly reported to be unlikely. Whatever may be said about the abstract fairness of this situation, it did not produce a cognizable conflict of interest. If either attorney failed to provide adequate representation, for any reason, that fact is properly taken into account on its own merits, because such inadequacy implicates constitutional considerations. No documentation of such inadequacy has been made. (We discuss the specific claims of ineffective representation in an unpublished section of this opinion.)
 

 Appellant Garcia argues that, given what he claims is a conflict of interest situation, the trial court should have inquired further about the problem, presumably of Garcia personally. He cites
 
 Wood
 
 v.
 
 Georgia, supra,
 
 450 U.S. 261, 272 [67 L.Ed.2d 220, 230-231], for the proposition that there is a duty to inquire into the effectiveness of counsel when the “possibility of a conflict” becomes apparent.
 
 Wood
 
 v.
 
 Georgia
 
 is a multiple representation case (450 U.S. at pp. 262, 266 [67 L.Ed.2d at pp. 225, 227]), and the court’s admonition reflected earlier precedent which holds that, while the Sixth Amendment does not require a judge to
 
 initiate
 
 an inquiry in this situation, the judge must pursue the issue if an objection is raised. (See
 
 Cuyler
 
 v.
 
 Sullivan
 
 (1980) 446 U.S. 335, 346, 348 [64 L.Ed.2d 333, 345, 346, 100 S.Ct. 1708].)
 

 There are several obvious distinctions between these cases and our case. First, this case does not involve multiple representation. Second, as we have pointed out, the issues it does raise are not properly classified as presenting a conflict of interest. Next, the trial judge held a lengthy hearing on the issues presented, and was assured that defense counsel were ready, willing
 
 *50
 
 and able to proceed to trial on behalf of their clients however the court ruled on the compensation issue, and that their clients had no wish to change attorneys. There never was any threat by these attorneys that they would reduce their efforts on behalf of their clients unless the compensation issue was resolved to their liking. Finally, we note that Garcia was fully capable of speaking up about his representation if he thought it useful to do so. This is shown by his midtrial request (on other grounds) to change attorneys.
 

 Nor are counsel correct in arguing a per se standard for reversal in the event a conflict of interest is found. That extreme remedy is usually reserved for cases in which the constitutional violation is of such dimension as to defy analysis of its actual effect on the trial. (See
 
 Arizona
 
 v.
 
 Fulminante, supra,
 
 499 U.S__[113 L.Ed.2d 302, 111 S.Ct. 1246], where the court spoke of denial of counsel in the context of a total abrogation of the right to counsel.) California follows the federal rule that claims of ineffective representation are measured by quite another standard: “whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.”
 
 (Strickland
 
 v.
 
 Washington
 
 (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692-693, 104 S.Ct. 2052];
 
 People
 
 v.
 
 Ledesma
 
 (1987) 43 Cal.3d 171, 214 [233 Cal.Rptr. 404, 729 P.2d 839] [adopting
 
 Strickland
 
 approach];
 
 People
 
 v.
 
 Cooper
 
 (1991) 53 Cal.3d 771, 831 [281 Cal.Rptr. 90, 809 P.2d 865].)
 

 In federal jurisprudence, “the possibility of conflict is insufficient to impugn a criminal conviction.”
 
 (Cuyler
 
 v.
 
 Sullivan, supra,
 
 446 U.S. 335, 350 [64 L.Ed.2d 333, 348].) In
 
 Cuyler,
 
 the court reviewed a claim of conflict arising out of joint representation of codefendants by a single attorney. The court observed that the possibility of conflict exists in every case of multiple representation, and that a defendant has a right to point it out and to have the trial court review the issue. “But unless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel.”
 
 (Id.
 
 at p. 348 [64 L.Ed.2d at p. 346].)
 

 A potential conflict of interest arising out of multiple representation is subject to a “somewhat more rigorous” standard of review under the California cases: whether or not there is an objection at trial, “even a potential conflict may require reversal if the record supports ‘an informed speculation’ that appellant’s right to effective representation was prejudicially affected.”
 
 (People
 
 v.
 
 Mroczko
 
 (1983) 35 Cal.3d 86, 104, 105 [197 Cal.Rptr. 52, 672 P.2d 835].)
 

 We agree that considered before trial and in the abstract, there is a basis for an informed speculation of prejudice when a protesting defendant is
 
 *51
 
 forced to go to trial with unpaid counsel. “The risk in compelling a defendant to go to trial with unpaid counsel against his wishes and those of his attorney, is that the defendant will ‘get what he paid for.’ ”
 
 (People
 
 v.
 
 Ortiz, supra,
 
 51 Cal.3d 975, 985.) In
 
 Ortiz,
 
 the client wanted to discharge his lawyer, and the lawyer wanted to be relieved (because he was not being paid). That placed the trial court’s error in the same posture as though the court had denied the right to counsel altogether, or had improperly refused a request for self-representation; reversal was required. (51 Cal.3d at p. 988.)
 

 In this case, every indication to the court was that Ramirez and Garcia wanted to keep their retained attorneys, and the attorneys indicated no wish to be removed from that representation (they simply wanted to be paid). Except for Garcia’s midtrial motion to change attorneys, there never was any indication of dissatisfaction or complaint by either appellant, or by their attorneys. As we already have observed, these distinctions take the case out of the per se reversal required in
 
 Ortiz.
 
 Instead, we are able to address any “informed speculation” that may arise by examination of the substantial record produced in the trial court. We have done so and find no fault with the representation given to appellants by their attorneys.
 

 I C, II
 
 *
 

 III
 

 Bodily Harm
 

 Four arguments are presented concerning the bodily harm element of section 209, subdivision (a), as it applies to this case. The first is that the provision is unconstitutionally vague. The next two contentions challenge instructions given on the issue. The fourth challenges the sufficiency of evidence as to one of the appellants.
 

 A.
 
 Vagueness
 

 Appellants were convicted under the portion of section 209, subdivision (a) which provides that one who kidnaps for ransom shall receive a punishment of life imprisonment without possibility of parole where the person
 
 *52
 
 kidnapped “suffers death or bodily harm.” Appellant Garcia argues that this provision is unconstitutionally vague.
 

 It is, of course, a maxim of due process that if persons are to be held to criminal penalties for their conduct, the state must describe the sanctionable conduct with sufficient precision so that persons have fair notice what conduct is forbidden. (See
 
 Lanzetta
 
 v.
 
 New Jersey
 
 (1939) 306 U.S. 451 [83 L.Ed. 888, 59 S.Ct. 618] [leading case on the principle, holding the term “gangster” to be unconstitutionally vague].)
 

 Appellant’s particular argument is that the term “bodily harm” is too vague to afford him reasonable notice of what kind of injury inflicted during a kidnapping for ransom may result in the aggravated statutory penalty. We do not agree.
 

 There was a time when the term was construed according to its tort meaning as, simply, “ ‘any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person.’ ”
 
 (People
 
 v.
 
 Tanner
 
 (1935) 3 Cal.2d 279, 297 [44 P.2d 324]; see discussion of “great bodily harm” as contrasted with “bodily harm” in
 
 People
 
 v.
 
 Caudillo
 
 (1978) 21 Cal.3d 562, 577 [146 Cal.Rptr. 859, 580 P.2d 274].) For reasons unrelated to considerations of vagueness, the term came to be more narrowly construed as requiring a substantial or serious injury to the body of the kidnapped victim by application of physical force that is beyond that necessarily involved in the forcible kidnapping. (See
 
 People
 
 v.
 
 Schoenfeld
 
 (1980) 111 Cal.App.3d 671, 681 [168 Cal.Rptr. 762] [development traced and modern statement provided].)
 

 The jury was instructed accordingly, in terms of former CALJIC No. 9.22. We see no difficulty in applying this definition, which is at least as precise as any number of other phrases that have passed judicial muster. (See, e.g.,
 
 People
 
 v.
 
 Poulin
 
 (1972) 27 Cal.App.3d 54, 61 [103 Cal.Rptr. 623] [“great bodily injury”];
 
 People
 
 v.
 
 Beauford
 
 (1977) 79 Cal.App.3d Supp. 1, 4 [145 Cal.Rptr. 173] [“obscene live conduct”];
 
 People
 
 v.
 
 Kirk
 
 (1975) 49 Cal.App.3d 765, 768 [122 Cal.Rptr. 653] [“dangerous”];
 
 People
 
 v.
 
 Beaugez
 
 (1965) 232 Cal.App.2d 650 [43 Cal.Rptr. 28] [danger to child’s “life or limb”].)
 

 There can be no doubt about the application of the standard to Suarez’s injuries, which were far from the margin of the term. At the outset of his abduction he was hit so hard that he became faint and fell down; he was repeatedly struck in the head, he was struck with fists, kicked, and hit with a shotgun and a baseball bat; his injuries were such that at the time of trial,
 
 *53
 
 he still had difficulty in “making efforts” with his right arm; he suffered severe contusions to his back, chest and legs, and underwent knee surgery that he attributed to the beatings he suffered during the kidnapping. If his testimony and that of others who saw him is credited, as we presume that it was, he undoubtedly suffered “bodily harm.”
 

 Ill B-D, IV
 
 *
 

 V
 

 Sentencing Issues
 

 Three claims of sentencing error are presented. Appellants Ramirez and Mendizaval argue that the punishment of life imprisonment without possibility of parole for kidnapping for ransom with bodily harm exceeds constitutional limitations. Appellant Mendizaval also argues that his sentence is disproportionate under the principles of
 
 People
 
 v.
 
 Dillon
 
 (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697], Finally, appellant Garcia challenges the multiple personal armed use enhancements imposed under section 12022.5. We begin our review with the broad constitutional challenge.
 

 A.
 
 Cruel or Unusual Punishment
 

 Appellants Ramirez and Mendizaval invoke the state constitutional prohibition against cruel or unusual punishment. California Constitution, article I, section 17 provides: “Cruel or unusual punishment may not be inflicted or excessive fines imposed.”
 
 [5]
 
 They argue that when the tripartite test of disproportionality used in California jurisprudence is applied, the mandatory life term required by section 209, subdivision (a) is revealed as excessive.
 

 The test, articulated in
 
 In re Lynch
 
 (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921], and uniformly followed in this state, examines the nature of the offense and the offender, with particular regard to the degree of danger that both present to society; it compares the challenged penalty with penalties imposed in California for more serious crimes; and it
 
 *54
 
 compares the penalty with penalties imposed in other jurisdictions for the same crime. (See
 
 In re Reed
 
 (1983) 33 Cal.3d 914, 923 [191 Cal.Rptr. 658, 663 P.2d 216].)
 
 [6]
 

 Counsel for Garcia has presented a detailed analysis, collecting data about punishments imposed for other crimes in California, and for the same crime in other states. The data indicate that the mandatory life term for aggravated kidnapping with bodily harm is greater than the punishment for nonspecial circumstance first degree murder as well as second degree murder (indefinite terms that permit parole), and that (by definition) it is greater than punishment under determinate term sentencing. The mandatory life term also places the California punishment among the most severe in the nation for the aggravated offense with bodily harm.
 

 Nevertheless, we are not persuaded that the punishment is constitutionally excessive. The same issue has been presented in the context of the same or similar analysis on several occasions. It has been uniformly rejected. (See
 
 In re Maston
 
 (1973) 33 Cal.App.3d 559 [109 Cal.Rptr. 164];
 
 People
 
 v.
 
 Isitt
 
 (1976) 55 Cal.App.3d 23, 27 [127 Cal.Rptr. 279];
 
 People
 
 v.
 
 Ordonez
 
 (1991) 226 Cal.App.3d 1207, 1236 [277 Cal.Rptr. 382].) In
 
 Ordonez,
 
 we pointed out that “[t]he selection of a proper penalty for a criminal offense is a legislative function involving an appraisal of the evils to be corrected, the weighing of practical alternatives, and consideration of relevant policy factors and responsiveness to the public will.” (226 Cal.App.3d at p. 1236.) This broad legislative discretion is subject to constitutional limitation, but given the long-standing, even ancient, horror of kidnapping
 
 (id.
 
 at p. 1225, fn. 7, and related text) and the substantial risk to human life that it presents
 
 (id.
 
 at p. 1237), we concluded that the punishment is not excessive.
 

 We see no reason to alter that view. As the
 
 Maston
 
 court put it almost 20 years ago when the
 
 Lynch
 
 decision was new, the disproportionality rule should be understood “to authorize constitutional interference only for gross excessiveness in relation to the rest of the nation. The augmented California sentence is not so out of line with the scale of punishments throughout the nation that a court may call it either cruel or unusual.” (33 Cal.App.3d at p. 566.)
 

 B.
 
 Dillon Analysis
 

 Appellant Mendizaval moved the trial court to exercise its authority under section 1385 to strike the finding of bodily harm.
 

 The court
 
 *55
 
 chose not to exercise its discretion under that statute.
 
 [7]
 
 On appeal, he argues that application of the principles of
 
 People
 
 v.
 
 Dillon, supra,
 
 34 Cal.3d 441, compels a reduction of his sentence.
 

 In
 
 Dillon,
 
 the Supreme Court invoked the branch of
 
 Lynch
 
 analysis that focuses on the particular culpability of the offender, applying that standard “in the concrete rather than the abstract.”
 
 (Id.
 
 at p. 479.) The court reduced a first degree felony-murder sentence to second degree murder. In doing so, it emphasized the wide range of individual culpability encompassed within first degree felony-murder, as contrasted with deliberate, premeditated murder. The felony-murder aspect of the crime includes “a variety of unintended homicides.” (34 Cal.3d at p. 477.) The same cannot be said of aggravated kidnapping with bodily harm. We also note that most of the cases following
 
 Dillon
 
 have involved attempts to reduce a first degree murder sentence to a lesser punishment. Even with respect to first degree felony-murder, the
 
 Dillon
 
 application of proportionality analysis “must be viewed as representing an exception rather than a general rule.”
 
 (People
 
 v.
 
 Munoz
 
 (1984) 157 Cal.App.3d 999, 1014 [204 Cal.Rptr. 271];
 
 People
 
 v.
 
 Kelly
 
 (1986) 183 Cal.App.3d 1235, 1247, fn. 1 [228 Cal.Rptr. 681].)
 

 Dillon
 
 amplifies the three-part test of
 
 Lynch
 
 by adding a three-part examination of its own. The court is called upon to consider “(1) the circumstances and nature of the offense and defendant’s role in it, (2) the nature and background of the defendant, and (3) the punishments imposed on other participants in the crime.”
 
 (People
 
 v.
 
 Smith
 
 (1986) 187 Cal.App.3d 666, 682 [231 Cal.Rptr. 897].)
 

 Assuming this test is applicable to appellant, it does not aid him. Two persons were kidnapped at gunpoint as they left their residence; both were held for prolonged periods, one of them under particularly cruel circumstances; both were repeatedly beaten, and at least one suffered bodily harm during the ordeal; the object of the crime was to extract payment for the release of one of the victims. Both victims were threatened with death; one was repeatedly threatened, and terrified. Firearms were used from the time of the abduction through the rescue. One of the kidnappers was killed by police during the course of the crimes.
 

 Mendizaval apparently acted as a guard over Suarez. He did it for money, and he must have been fully aware of the conditions of Suarez’s captivity.
 
 *56
 
 When he was arrested during the effort to spirit Suarez to another location as police started to close in, five shotgun shells were found in Mendizaval’s jacket pocket. He had just participated in the final acts of brutality directed against Suarez: throwing him inside a van, with his mouth taped shut, telling him that he would be killed if he moved, and covering him with a blanket.
 

 Each of the four appellants received a term of life imprisonment without possibility of parole; Mendizaval cannot claim that his punishment was greater than that of any other defendant. Although the trial court could have imposed a greater determinate sentence under the verdict as rendered by the jury, it chose to impose only a one-year determinate term.
 

 While Mendizaval may not have been the most culpable of the participants in the crimes, the punishment is not constitutionally excessive in light of the nature of the crimes and his personal culpability.
 

 C.
 
 Consecutive Personal Armed Use
 
 Enhancements
 
 *
 

 Disposition
 

 The judgments of conviction are affirmed.
 

 Woods (A. M.), P. J., and George, J., concurred.
 

 Petitions for a rehearing were denied August 30, 1991, and appellants’ petition for review by the Supreme Court was denied November 14, 1991. Kennard, J., and George, J., did not participate therein.
 

 [1]
 

 All further code references are to the Penal Code unless otherwise stated.
 

 [2]
 

 Section 987.2 is principally concerned with payment to “assigned” (appointed) counsel. The principal statutory provision for the appointment itself in noncapital cases is found in section 987, subdivision (a), and we refer to the request for appointment as having been made under that authority.
 

 [3]
 

 Code of Civil Procedure section 284 provides in part:
 

 “The attorney in an action or special proceeding may be changed at any time before or after judgment or final determination as follows: . . . ffl] Upon the order of the court, upon the application of either client or attorney, after notice from one to the other.”
 

 *
 

 See footnote,
 
 ante,
 
 page 36.
 

 *
 

 See footnote,
 
 ante,
 
 page 36.
 

 [5]
 

 Compare the analogous provision in the Eighth Amendment: “nor cruel and unusual punishments inflicted.” (See
 
 People
 
 v.
 
 Anderson
 
 (1972) 6 Cal.3d 628, 634 [100 Cal.Rptr. 152, 493 P.2d 880] [noting distinction between disjunctive and conjunctive forms, and discussing its legal significance].)
 

 [6]
 

 We note recent discussion about the propriety of proportionality analysis under the Eighth Amendment. (See
 
 Harmelin
 
 v.
 
 Michigan
 
 (1991) 501 U.S._[115 L.Ed.2d 836, 111 S.Ct. 2680].) We need not pursue that issue, since proportionality analysis continues to be required under commanding court interpretations of the California Constitution, upon which appellants rely.
 

 [7]
 

 The court is empowered to strike the bodily harm finding of section 209, subdivision (a).
 
 (People
 
 v.
 
 Marsh
 
 (1984) 36 Cal.3d 134, 142 [202 Cal.Rptr. 92, 679 P.2d 1033].) Had it done so, the sentence for count I would have been life imprisonment with the possibility of parole, since Mendizaval had been convicted of kidnapping for ransom. (§ 209, subd. (a).)
 

 *
 

 See footnote,
 
 ante,
 
 page 36.