Filed 2/25/14  P. v. Cantu CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PEDRO CANTU,<br><br>    Defendant and Appellant. | B241736<br><br>(Los Angeles County<br>Super. Ct. No. TA118730) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

        Alan Stern, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Pedro Cantu, appeals his conviction for kidnapping to commit robbery, kidnapping for extortion, criminal threats, burglary, torture and possession of a firearm by a felon, with criminal street gang, great bodily injury and firearm use enhancements (Pen. Code, §§ 209, subd. (a) & (b)(1), 422, 459, 206, [former] 12021, 186.22, subd. (b), 12022.7, 12022.53).[1] He was sentenced to state prison for a term of life without possibility of parole plus 10 years.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

Rodrigo Hernandez worked as a cabinet-maker. On June 22, 2011, a man called him about a job and they agreed to meet the following morning so Hernandez could prepare an estimate. The man said he would call again the next day and give Hernandez the address where they should meet.

About 6:45 a.m. the next day, the same man phoned Hernandez and directed him to drive to the intersection of Wilmington and El Segundo in Compton. He did not give Hernandez an exact address, but said he would call again when Hernandez got closer. Hernandez received two more phone calls as he approached the intersection and then he saw defendant Cantu standing on the street corner. Cantu gestured and directed Hernandez into a carport near the back of an apartment complex on El Segundo.

After Cantu confirmed Hernandez was the cabinet-maker, a second man entered the carport and used a taser gun to shock him. When Hernandez asked what was going on, Cantu pulled a handgun from his waistband and pointed it at him. Hernandez was then hit in the back of the head by the second man. He fell to the ground, where he was repeatedly punched and kicked. He begged them not to kill him. Still pointing the gun at

---

[1] All further references are to the Penal Code unless otherwise specified.

Hernandez, Cantu said "I don't know what you have done." When Hernandez replied, "What did I do? I haven't done anything. You got the wrong person," Cantu told him to be quiet and that someone was coming to talk to him.

The men tied Hernandez's hands and feet with plastic cuffs and they put a denim bag over his head. When Hernandez again begged them not to kill him, Cantu told him to shut up. Hernandez felt hands reach into his pockets and take his cell phone, wallet and keys. The men then dragged him out to the driveway and put him into the trunk of a white SUV. (Hernandez could see out of the bottom of the denim bag.) The men threatened to kill him if he did not cooperate.

After 15 or 20 minutes two more people arrived. One of them said he knew all about Hernandez and his family. He knew the school schedules of Hernandez's daughters, who were two, twelve and fifteen years old. He knew what time Hernandez's wife went to school. Hernandez was terrified the men would harm his family if he refused to cooperate.

This same man told Hernandez he also knew about the money Hernandez kept at home. In fact, Hernandez had two safes in his apartment, one for documents and one for cash. His wife had access to the cash safe and knew how much money was in there. Hernandez and his wife used the safe instead of a bank because they were in the United States illegally and wanted immediate access to their savings in case of an emergency. The only person other than his wife whom Hernandez remembered talking to about the cash safe was his business partner. When the kidnapper asked if Hernandez would turn over the money from the cash safe, Hernandez agreed.

About 8:30 a.m. that morning, Hernandez's neighbor saw his pick-up truck near the stairway leading to his apartment. There were two Hispanic men in the truck.

Hernandez's wife, Juana Gazca, had left their apartment between 7:45 and 8:00 a.m. that morning to take the children to school. Upon her return, she found the front door and the security door both unlocked and the two safes missing. There had been between $19,000 and $23,000 in the cash safe.

An hour or two after Hernandez agreed to turn over the money, the men asked him for the safe combinations. The safes required both combinations and keys, but Hernandez could not remember the combinations and he did not have the keys. He then heard the sounds of an electric saw. Hernandez asked Cantu if everything was okay, and Cantu replied, "It seems to be. We will let you go right now." Then the SUV started moving. After a short drive, Hernandez was thrown from the SUV into an alley. His hands and feet were still bound and the bag was still over his head. Cantu told him to count to 50, and that if he called the police his "whole family would be dead." After hearing the SUV drive away, Hernandez untied his hands and removed the bag.

A bystander saw the white SUV drive away from the alley and went to help Hernandez, who was bleeding from the ears and the top of his head. Hernandez told the bystander "they are trying to kidnap him and his family" and "rob him," but he didn't want to call the police because they knew exactly where he lived and would kill his family.

Hernandez was hospitalized for injuries he sustained from being punched, kicked, electrocuted and hit on the head with something hard. His ear had been slit in many places. He suffered headaches for months afterwards.

On the day of the crime, Hernandez identified Cantu from a photo array and police executed a search warrant at Cantu's mother's house. Inside the detached garage where Cantu stayed, officers found his driver's license and twelve $100 bills. A white SUV parked outside was registered to his mother, but everyone in the family drove it. The car's interior was wet as though it had been shampooed and the exterior also appeared to have been recently cleaned. Cantu was arrested at his sister's house that same night. His sister lived on Wilmington Avenue near where Hernandez had been abducted. Cantu denied any involvement in the crime.

Detective John Ganarial testified as a gang expert. He explained that gangs cultivate a violent reputation to dissuade people in the community from cooperating with the police and to facilitate the commission of future crimes. In addition, a gang's violent reputation makes it more attractive to new recruits and helps prevent territorial

4

encroachment by rival gangs. Gang members are expected to commit violent crimes, which is known as "putting in work."

Ganarial was familiar with the Six Hood Compton Crips gang, which claims a territory consisting of one long block on 126th Street between Wilmington and Willowbrook Avenues. There are probably 20 gangs in the Willowbrook area. The Six Hood Compton Crips are a small gang with only 20 or 25 members. They were originally a clique within the Mona Park Gang, a much larger gang. Ganarial testified he has spoken to members of "Mona Park or Six Hood Compton Crips about them cliquing up together." He explained: "Gangs cliquing up with each other. It's very common now. It's one of the biggest gang trends in Compton right now. Because even with the bigger gangs, you are only going to have so many hardcore members putting in work, like doing shootings, robberies. [¶] Gangs have been cliquing up. We have actually seen where not only are they cliquing up, but they are actually claiming the same gang. I have seen three Crip gangs – an example would be 'ATF', Acacia Block, Spook Town Farm Dogs. They have cliqued up so much that they will actually claim the same neighborhood. It's fairly common now in Compton."

The primary activities of the Six Hood Compton Crips include "shootings, robberies, vandalism, vehicle thefts . . . drug sales." The assaults consisted of both armed assaults and "assaults without a firearm where they just beat people up, robberies, attempted robberies." These "primary principal activities" are regularly committed by the Six Hood Compton Crips: "That is their gig. It's what they do."

Ganarial opined that Cantu was a member of the Six Hood Compton Crips. Given a hypothetical question based on the evidence in this case, Ganarial opined Cantu's three accomplices were likely to have been gang associates of his, or they could have been members of other gangs. He opined Hernandez's abduction had been committed in association with the Six Hood Compton Crips because these types of crimes – robbery, kidnapping, extortion and violent assault – are crimes that elevate a member's status within the gang and instill fear in the community. Such crimes benefit the gang's reputation and are monetarily enriching. The proceeds would be divided up and the

5

money often used to purchase communal gang guns. Committing such crimes in broad daylight in a busy area is a blatant demonstration the gang is not afraid that anyone in the community will report them to the police.

2. *Defense evidence.*

Cantu testified in his own behalf. He had been stopped by Detective Ganarial more than 10 times. Although he was not a gang member himself, he knew many Six Hood Compton Crips members; he also knew many members of the Carvers and Mona Park gangs. Although gang members congregate at his house, he denied it was a "launching point for the purpose of committing various crimes." The money found in his bureau drawer belonged to his fiancée.

Cantu testified that on June 22, 2011, he had just been released from jail and was sitting on the porch of his mother's house. Deondre Millinder, whose nickname was "Stone," often sold Cantu marijuana. Stone came by in a car driven by a Hispanic man Cantu didn't know. Stone offered Cantu $100 and a tank of gas if he would do some driving. Stone wanted him to drive his family's white SUV because it would attract less attention. Cantu understood he was getting involved in a drug deal.

The next morning he picked up Stone, who made calls to Hernandez using Cantu's cell phone. Hernandez showed up about 7:30 a.m., and he, Cantu and Stone drank alcohol and smoked marijuana. Cantu got hungry and left on foot to find some food. When he returned, he discovered Hernandez was in the back of the white SUV. A bag covering Hernandez's head was bloody; his hands and feet were tied. Hernandez had been beaten and he was begging not to be killed. Cantu was shocked because he thought this was just supposed to be a drug deal. He argued with Stone about Hernandez's treatment and the fact Hernandez had been put into the back of the SUV. After arguing with Stone, Cantu removed Hernandez from the SUV and drove off. Before leaving, Cantu left the impression he was going to report Stone to the police. He went home and cleaned the blood from the rear of the SUV, knowing he was destroying evidence of a crime.

6

Cantu knew Stone was a gang member.  He wasn't sure if Stone belonged to the Mona Park Crips, but he definitely knew Stone was a gang member.  Because of the argument over Hernandez's treatment, Cantu feared Stone might think he was going to snitch and, in order to retaliate, that Stone might kill Cantu and members of his family.

## CONTENTS

1.  There was insufficient evidence to sustain the gang enhancement findings.

2.  Cantu's sentence of life without possibility of parole constituted cruel and unusual punishment.

## DISCUSSION

1. *There was sufficient evidence of the gang enhancement.*

Cantu contends there was insufficient evidence to sustain the criminal street gang enhancement finding.  He argues the evidence showed his crimes had been nothing more than a personal frolic unrelated to any gang activity.  This claim is meritless.

  a.  *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the

7

circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.) The gang enhancement then requires two further elements: evidence of "a felony committed for the benefit of, at the direction of, or in association with any criminal street gang," and evidence the felony was committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

"A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) A gang expert may testify on the ultimate question of whether the defendant was acting for the benefit of a gang. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 509 [where participants were diverse group affiliated with various gangs, trial court did not abuse its discretion by letting gang expert testify "the participants acted for the benefit of each and every gang represented by the caravan"].)

b. *Discussion*.

Cantu contends there was insufficient evidence to establish the "for the benefit of, at the direction of, or in association with" element of the gang enhancement. Not so. This element of the gang enhancement is given in the disjunctive: "for the benefit of, at

8

the direction of, *or* in association with." Here, the gang expert testified Cantu committed these crimes for the benefit of and in association with a gang, and Cantu himself testified he knew Stone was a gang member.

Detective Ganarial gave a number of reasons why he believed these crimes had been committed for the benefit of the Six Hood Compton Crips. "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1). (See, e.g., *People v. Vazquez* (2009) 178 Cal.App.4th 347 . . . [relying on expert opinion that the murder of a nongang member benefited the gang because 'violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, "fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang" ']; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 . . . [relying on expert opinion that 'a shooting of any African American men would elevate the status of the shooters and their entire [Latino] gang'].)" (*People v. Albillar* (2010) 51 Cal.4th 47, 63.)

Ganarial also testified Cantu had committed these crimes "in association with" other gang members:

"Q.  Is it part of your opinion that this crime would only be committed . . . with Six Hoods or maybe perhaps with other gang members or associates from gangs that might clique up with Six Hoods like Mona Park or similar gangs?

"A.  Yeah.  It's very possible that if they weren't actual Six Hood gang members that they could be members of other gangs."

This was sufficient evidence to prove the "in association with" element. (See *People v. Albillar, supra,* 51 Cal.4th at p. 62 ["defendants came together *as gang members* to attack [the victim] and, thus . . . they committed these crimes in association with the gang"]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could

9

reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

Although "it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang" (*People v. Morales, supra,* 112 Cal.App.4th at p. 1198), there was no such evidence here. Cantu cites *People v. Ramon* (2009) 175 Cal.App.4th 843, where two fellow gang members were stopped in a recently stolen car inside their own gang territory with an unregistered firearm. *Ramon* held this was not enough evidence to sustain a gang enhancement: "There were no facts from which the expert could discern whether Ramon and Martinez were acting on their own behalf the night they were arrested or were acting on behalf of the Colonia Bakers. While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation." (*Id*. at p. 851.) But Cantu ignores this further statement by *Ramon*: "The analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang. That did not occur and we will not speculate." (*Id*. at p. 853.) Here, Ganarial testified the primary activities of the Six Hood Compton Crips included robberies, armed assaults and beating people up, and that crimes like robbery, kidnapping, extortion and violent assault benefit the gang's reputation and are monetarily enriching.

There was sufficient evidence to sustain the gang enhancement.

2. *LWOP sentence was not cruel and unusual punishment.*

Cantu contends his sentence of life without possibility of parole (LWOP) amounted to cruel and unusual punishment under both the California and the United States Constitutions. This claim is meritless.

The length of Cantu's sentence alone does not warrant relief. (See *Harmelin v. Michigan* (1991) 501 U.S. 957 [115 L.Ed.2d 836] [mandatory LWOP sentence for possessing more than 650 grams cocaine did not violate Eighth Amendment].)

10

Citing *People v. Dillon* (1983) 34 Cal.3d 441, and *In re Lynch* (1972) 8 Cal.3d 410, Cantu contends his sentence was disproportionate to his crime and to his individual culpability, and excessive when compared to the punishment imposed for more serious offenses. We are not persuaded.

In *Dillon*, an immature 17-year-old killed a man who had been guarding a marijuana crop that defendant and his friends were trying to steal; as the victim advanced on him with a shotgun, Dillon fired his .22 caliber rifle out of fear and panic. (*People v. Dillon, supra*, 34 Cal.3d at p. 487.) Cantu argues his case can be reasonably compared to *Dillon* because he was only 26 years old at the time of the crimes, he had no prior convictions for violent felonies, and he had not been the mastermind behind the crimes. As to the latter claim, Cantu asserts he "was recruited to participate, yet based on his criminal record, it can be inferred he had no idea what he was getting himself into."

We do not agree that Cantu's case is similar to *Dillon*. At 26 years old, Cantu was appreciably older than the 17-year-old Dillon. Moreover, according to uncontradicted expert testimony, Dillon was an extremely immature 17-year-old who reacted emotionally "by denying the reality of stressful events and living rather in a world of make-believe." (*People v. Dillon, supra,* 34 Cal.3d at p. 483.) Moreover, the homicide in *Dillon* had been "a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger." (*Id.* at p. 488.) Dillon thought he was about to be killed when he fired on the victim. There is no comparison to Cantu's situation. Cantu was a major participant in a kidnap for extortion scheme in which the victim was beaten, tasered, bound hand and foot, sliced in the ear, crammed into the trunk of an automobile and then dumped in an alley.

Cantu acknowledges that case law has routinely affirmed the imposition of LWOP terms for violating section 209, subdivision (a), in the face of Eighth Amendment claims, but he argues "the distinction between the sentence that can be imposed for kidnapping for robbery with injury (life with the possibility of parole) and kidnapping for extortion with injury (LWOP) is inherently unfair based on the nebulous distinction between these two crimes, especially in single victim cases of kidnapping for extortion for injury."

11

Cantu asserts: "Frankly, it is hard to fathom how one convicted of kidnapping for robbery with injury, attempted murder with injury, or more significantly first degree murder (absent special circumstances), can be eligible for parole, while one convicted of kidnapping for extortion with injury, not death, in a single victim case is subjected to an LWOP sentence."

It is recognized that "kidnapping for ransom is 'the most serious form of kidnapping' in California. [Citation.] The offense involves a primary victim (who is seized, confined, or otherwise subjected to a predicate act) and a secondary victim (who 'is subjected to a ransom or extortion demand'). [Citations.] Kidnapping for ransom does *not* require that the defendant move the victim. [Citation.] In contrast, California's other forms of kidnapping (simple kidnapping, aggravated kidnapping for robbery or rape, and aggravated kidnapping during carjacking – collectively, 'asportation kidnapping') all require movement of the victim. [Citation.]" (*People v. Eid* (2010) 187 Cal.App.4th 859, 868, fn. omitted.)

Claims "that the penalty for aggravated kidnapping for ransom is grossly disproportionate to the penalty imposed in other states and to penalties imposed for more serious offenses in California. . . . have been uniformly rejected. [Citations.]" (*People v. Chacon* (1995) 37 Cal.App.4th 52, 64.) *People v. Castillo* (1991) 233 Cal.App.3d 36, held an LWOP sentence for section 209, subdivision (a), did not constitute cruel and unusual punishment, pointing out:
"[T]he selection of a proper penalty for a criminal offense is a legislative function involving an appraisal of the evils to be corrected, the weighing of practical alternatives, and consideration of relevant policy factors and responsiveness to the public will.' [Citation.] This broad legislative discretion is subject to constitutional limitation, but given the long-standing, even ancient, horror of kidnapping [citation] and the substantial risk to human life that it presents [citation], we concluded that the punishment is not excessive." (*People v. Castillo, supra,* at p. 66.)

Cantu cites *People v. Ibrahim* (1993) 19 Cal.App.4th 1692, which concluded kidnapping for extortion does not require that the person from whom property is obtained be someone other than the kidnap victim. Cantu relies on the following hesitation expressed by *Ibrahim*: "We are disturbed, however, by the fact that where there is no secondary victim, the distinction between kidnapping for extortion and kidnapping for robbery can be subtle [citation], yet the difference in penalty is substantial where the result is death[:] life without possibility of parole for the former (Pen. Code, § 209, subd. (a)), but life with possibility of parole for the latter (Pen. Code, § 209, subd. (b)). We suspect the difference in penalty is rooted in the common (though not essential) involvement of multiple victims – primary and secondary – in kidnappings for extortion. Absent a secondary victim, we can discern no reason for punishing the kidnapper-extortionist far more severely than the kidnapper-robber. Nor, do we believe, should so great a difference in penalty hinge upon so subtle a distinction as that between extortion and robbery – whether property was taken *consensually* by force or fear (Pen. Code, § 518) or *nonconsensually* by force or fear (Pen. Code, § 211). We believe that where, as here, a kidnapping for extortion resulting in death does not involve a secondary victim, the magnitude of the crime is equal to that of a kidnapping for robbery resulting in death, and the two crimes should be equally punished. We therefore urge the Legislature to reconsider the sentencing schemes for these offenses." (*Id*. at pp. 1698-1699.)

But *Ibrahim* does not help Cantu. First, *Ibrahim* recognized that " 'the fixing of penalties for a crime is a legislative function . . . .' " (*People v. Ward* (2005) 36 Cal.4th 186, 218.) Second, the defendants there kidnapped, raped and murdered the victim in the course of extorting a promissory note from her, and there was no secondary victim. In the case at bar, however, Cantu and his accomplices kidnapped Hernandez in order to gain access to a safe full of money that was in his apartment. In order to accomplish this, the perpetrators threatened to harm Hernandez's family members if he did not cooperate and they burglarized his apartment to get their hands on the safe; burglaries are notoriously dangerous because residents may be unexpectedly present.

Cantu's LWOP sentence did not constitute cruel and unusual punishment.

13

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


CROSKEY, J.


ALDRICH, J.

14